## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

## (SOUTHERN DIVISION)

| | |
|---|---|
| ZACH LIU, derivatively on behalf of NEXTCURE, INC., | |
| | Civil Action No.: |
| c/o | |
| Murphy, Falcon & Murphy<br>1 South Street<br>30th Floor,<br>Baltimore, Maryland 21202 | **DEMAND FOR JURY TRIAL** |
| *Plaintiff,* | |
| v. | |
| MICHAEL RICHMAN, STEVEN P. COBOURN, KEVIN N. HELLER, M.D., ELAINE V. JONES, PH.D., DAVID KABAKOFF, PH.D., CHAU Q. KHUONG, JUDITH J. LI, BRIGGS MORRISON, M.D., GARRY A. NICHOLSON, TIM SHANNON, M.D., STEPHEN WEBSTER, and STELLA XU, | |
| c/o<br>NEXTCURE, INC.<br>9000 Virginia Manor Road<br>Suite 200<br>Beltsville, Maryland 20705 | |
| Serve on:<br>THE CORPORATION TRUST, INC.<br>2405 York Road<br>Suite 201<br>Lutherville-Timonium, Maryland 21093 | |
| *Defendants,* | |
| and | |
| NEXTCURE, INC.,<br>9000 Virginia Manor Road<br>Suite 200<br>Beltsville, Maryland 20705 | |

Serve on:
THE CORPORATION TRUST, INC.
2405 York Road
Suite 201
Lutherville-Timonium, Maryland 21093

*Nominal Defendant.*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Zach Liu ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant NextCure, Inc. ("NextCure" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Michael Richman ("Richman"), Steven P. Cobourn ("Cobourn"), Kevin N. Heller, M.D. ("Heller"), Elaine V. Jones, Ph.D. ("Jones"), David Kabakoff, Ph.D. ("Kabakoff"), Chau Q. Khuong ("Khuong"), Judith J. Li ("Li"), Briggs Morrison, M.D. ("Morrison"), Garry A. Nicholson ("Nicholson"), Tim Shannon, M.D. ("Shannon"), Stephen Webster ("Webster"), and Stella Xu ("Xu") (collectively, the "Individual Defendants," and together with NextCure, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of NextCure, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 21D of the Exchange Act, and Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire

and press releases published by and regarding NextCure, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by NextCure's directors and officers between May 8, 2019 and July 13, 2020, both dates inclusive (the "Relevant Period").

2.      NextCure is a clinical-stage biopharmaceutical company that discovers and develops immunomedicines to treat cancer and other immune-related diseases by restoring normal immune function, particularly using the Company's FIND-IO platform. Purportedly, the FIND-IO discovery platform enabled the Company to identify "multiple novel targets," including the target of the Company's lead product and most advanced treatment candidate, NC318.

3.      NC318 is an immunomedicine that targets an immunomodulatory receptor called Siglec-15 ("S15"). The Company has never generated revenues from product sales. Its sole source of revenues in 2019 and 2020 came from a multi-year research and development collaboration agreement with Eli Lilly and Company ("Lilly") (the "Lilly Agreement").

4.      In October 2018, NextCure initiated a Phase 1/2 clinical trial of NC318 in patients with advanced or metastatic solid tumors.

5.      In May 2019, NextCure went public through an initial public offering ("IPO"), selling 5.75 million shares of NextCure common stock at $15 per share, and generating approximately $86.25 in gross proceeds after the underwriters fully exercised their options (before deducting underwriting discounts and commissions and estimated offering expenses). The IPO closed on May 13, 2019.

6.      In November 2019, NextCure initiated a secondary public offering ("SPO" and, together with the IPO, the "Offerings"), offering 4,077,192 shares, or up to 4,688,770 shares if the underwriters exercised their option to purchase additional shares in full, at an offering price of $36.75 per share. The SPO closed on November 19, 2019, generating $172.2 million in gross proceeds for the Company.

7.      Leading up to the IPO and thereafter, the Individual Defendants highlighted the Company's "unique," "novel," and "proprietary" FIND-IO platform and its sophisticated development—credited to the Company's impressive management team. However, the Company's discovery platform was far from proprietary. In fact, during the years leading up to the IPO, between the IPO and the SPO, and continuing throughout the Relevant Period, the Individual Defendants misappropriated confidential information in establishing its so-called "novel" NextCure's technology, and solicited employees, customers, partners, and consultants from NextCure's competitor, Immunaccel Labs, LLC f/k/a Envisage, LLC ("Immunaccel"), while investors were entirely unaware due to incomplete and insufficient disclosures the Defendants made and/or caused to be made. Defendant Richman, in particular, served on Immunaccel's Board of Managers during the Relevant Period, and had inside knowledge into the scheme involving FIND-IO, which was the basis for the Company's collaboration with Lilly (the sole source of NextCure's revenue). Defendant Richman improperly duplicated the three-dimensional ("3D") technology and 3D assay of Immunaccel, to create, enhance or otherwise support NextCure's FIND-IO discovery platform, exposing the Company to potential legal and reputational risks from claims by Immunaccel. During the Relevant Period, the remaining Individual Defendants—who have vast relevant experience—turned a blind eye to the misconduct (collectively, the "Misappropriation Misconduct").

8.      Moreover, the Individual Defendants made or caused the Company to make misleading statements regarding the Company's leading treatment candidate (and the only product candidate from NextCure to reach clinical testing), NC318. Defendants foreseeably risked NextCure's post-IPO and SPO prospects and growth to glean short-term savings and to artificially inflate its stock price at the time of the IPO and SPO.

9.      Indeed, Defendants touted in the IPO and SPO Offering Documents (defined below), 2020 Proxy Statement (defined below), and in other public statements issued, filed, or made during the Relevant Period, that the Company's FIND-IO platform was "novel" and that NC318 was shown to be effective for a range of tumor types.

10.     During this time, the Individual Defendants failed to disclose the truth about NextCure's business and operations. As further detailed below, the IPO and SPO Offering Documents, as well as other statements made and/or caused to be made by the Individual Defendants identified herein, were materially false, misleading and incomplete in violation of the federal securities laws and Defendants' disclosure obligations.

11.     Prior to the IPO and throughout the Relevant Period, the Individual Defendants had routine access to updated data from the Company's Phase 1/2 clinical trial and clinical results related to NC318. To bolster the Company's stock price and prospects, especially just before initiating the SPO, the Individual Defendants selectively disclosed positive information concerning the study—and concealed negative results in the Company's November 5, 2019 abstract on the trial. The Individual Defendants were successfully in their ploy, and the Company's stock price shot upwards of 250% (or $65.79 per share) in response to positive disclosures related to the NC318 study before the SPO. When the Company updated some of its data to reveal negative results that weighed against its prior representations, the Company's stock price fell accordingly

between November 6, 2019 and November 11, 2019, losing more than 50% of the artificial gains experienced earlier in November 2019.

12.     Still, the Individual Defendants continued to tout positive results from the NC318 study and the products' purported demonstrated potential, which allowed the Company's stock price to stay at an inflated rate during the SPO.

13.     Through the Offerings, the Individual Defendants caused over $258 million worth of NextCure stock to be sold to investors based on offering materials that contained false and misleading statements.

14.     Just a few months after the SPO, the truth about NextCure's business and operations began to emerge. On January 13, 2020, the Company announced in a current report filed with the SEC on Form 8-K that Lilly was terminating its collaboration deal with NextCure, effective March 2020. On this news, NextCure's stock price fell $4.70 per share, or almost 8.29%, from closing at $56.70 per share on January 10, 2020 to close at $52.00 per share on January 13, 2020.

15.     On February 12, 2020, Immunaccel initiated a lawsuit against Defendant Richman in the Delaware Court of Chancery, alleging, *inter alia*, breach of contract and dissemination of confidential business information and revealing that Defendant Richman had copied Immunaccel's technology to create the FIND-IO platform. According to the complaint, two years before founding NextCure in 2013, Defendant Richman was recruited to assist Immunaccel in establishing a 3D platform for cancer research to study the microenvironment in tumors. The Company had entered into a customer agreement with Immunaccel in 2016, before the IPO, in connection with their shared interests in the 3D technology. In line with this agreement, the Company entered into a Contract Services Agreement, whereby Defendant Richman and thus Individual Defendants, as officers and directors of the Company, were given access to confidential trade secrets surrounding

Immunaccel's 3D technology platform. This confidential information formed the basis of NextCure's "proprietary" technology, which was a mere duplicate of Immunaccel's existing platform.

16.     On May 29, 2020, NextCure presented a poster at the 2020 American Society of Clinical Oncology ("ASCO") meeting that showed that the Company's clinical data was still preliminary. Analysts thereafter started to question the trial. In response, NextCure's stock price fell $4.51 per share, or 13.58%, from closing at $33.20 per share on May 28, 2020 to closing at $28.69 on June 2, 2020.

17.     On June 24, 2020, Immanuccel inexplicably voluntarily dismissed its lawsuit against Defendant Richman. Although not disclosed, upon information and belief, these claims were settled for an amount unknown.

18.     On July 13, 2020, NextCure published a press release in which Defendant Richman admitted that the data regarding the results for certain tumors was "disappointing." Moreover, the clinical trial was plagued with issues that inhibited its prospects of gaining the type of regulatory approval that other supposedly similar product candidates could. Based on the poor results from the clinical trial's first phase, NextCure abandoned phase 2 of the study, which happened to also be the most significant study for the products' commercial prospects. On this news, NextCure's shares plunged $9.73 per share, or over 54%, from closing at $17.88 per share on July 10, 2020, to close at $8.15 per share on July 13, 2020, on unusually high trading volume of almost 6.7 million shares.

19.     Throughout the Relevant Period, in breach of their fiduciary duties, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements and omissions regarding the Company's business, operations, prospects,

and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the Misappropriation Misconduct; (2) that the complete NC318 data Defendants possessed did not show that the drug was effective or provide an objective response, especially in most tumor types; (3) that NC318's study protocol was improper and was nevertheless not designed to demonstrate efficacy; and (4) NextCure failed to maintain internal controls, foreseeably placing NextCure's long-term post-IPO and post-SPO prospects at risk.

20.    As a result of the foregoing, the Company's public statements were materially false and misleading during the Relevant Period. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for, *inter alia*, breaching their fiduciary duties.

21.    The subject matter of the false and misleading statements discussed herein involved NextCare's key product platform, lead product candidate, and sole source of revenue. The misrepresentations concerning these core operations could not have escaped the Individual Defendants' notice had they been appropriately undertaking their responsibilities. The Individual Defendants thus had knowledge of the schemes and/or acted with reckless disregard for the truth.

22.    In further breach of their fiduciary duties, the Individual Defendants engaged in and/or allowed the Company and Defendant Richman to engage in the Misappropriation Misconduct. The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

23.    In light of the Individual Defendants' misconduct, which has subjected the Company, and several of its officers and directors, including its Chief Executive Officer ("CEO"),

Defendant Richman, to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were unjustly compensated by the Company and/or who benefitted from the wrongdoing alleged herein, and any losses connected with settling the claims made by Immanuccel, the Company has had and will have to expend many millions of dollars.

24.     In light of the breaches of fiduciary duties by the Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of NextCure's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Sections 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1).

26.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

31.     Venue is proper in this District because NextCure and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

32.     Plaintiff is a current shareholder of NextCure. Plaintiff has continuously held NextCure common stock at all relevant times.

### Nominal Defendant NextCure

33.     NextCure is a clinical-stage biopharmaceutical company that discovers and develops immunomedicines to treat cancer and other immune-related diseases by restoring normal immune function. The Company was incorporated in Delaware in 2011 and went public in the IPO in May 2019. NexCure's stock trades on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "NXTC." The Company's corporate headquarters are located at 9000 Virginia Manor Road, Suite 200, Beltsville, Maryland 20705.

**Defendant Richman**

34.    Defendant Richman co-founded the Company and has served as the CEO and President and as a Company director since October 2015. According to the Company's Schedule 14A filed with the SEC on April 27, 2020 (the "2020 Proxy Statement"), as of April 23, 2020, Defendant Richman beneficially owned 673,325 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Richman owned approximately $24,307,033 worth of NextCure stock.

35.    For the year ended December 31, 2019, Defendant Richman received $625,679 in compensation from the Company. This included $418,534 in salary, $204,000 in non-equity incentive plan compensation, and $3,145 in all other compensation.

36.    The 2020 Proxy Statement provides the following about Defendant Richman:

> Mr. Richman co-founded our company and has served as our President, Chief Executive Officer and a member of the Board since October 2015. Mr. Richman served as President and Chief Executive Officer of Amplimmune, Inc. (now MedImmune, LLC), a biopharmaceutical company focused on immuno-oncology, from 2007 to August 2015, including through Amplimmune's acquisition by AstraZeneca plc in October 2013. Before Amplimmune, Mr. Richman served as Executive Vice President and Chief Operating Officer of MacroGenics, Inc., a biopharmaceutical company focused on the treatment of cancer, from 2002 to 2007. Mr. Richman joined MacroGenics with approximately 20 years' experience in corporate business development within the biotechnology industry. Mr. Richman has served as a director of publicly traded Pieris Pharmaceuticals, Inc., a clinical-stage biotechnology company, since December 2014 and as a director of Madison Vaccines, Inc., a private company, since May 2014. Mr. Richman was previously a member of the board of directors of GenVec, Inc. from April 2015 until its acquisition by Intrexon Corporation in June 2017 and Opexa Therapeutics, Inc. from June 2006 until its acquisition by Acer Therapeutics in September 2017. Mr. Richman received a B.S. in genetics and molecular biology from the University of California at Davis and an M.S.B.A. in international business from San Francisco State University.

37.    Notably, the Company's 2020 Proxy Statement provides that Defendant Richman is not independent.

**Defendant Cobourn**

38.     Defendant Cobourn has served as the Company's Chief Financial Officer ("CFO")

since January 2018.

39.     The Company's 2020 Proxy Statement states the following about Defendant

Cobourn:

> Steven P. Cobourn, CPA has served as our Chief Financial Officer since January
> 2018. Previously, he served as Chief Financial Officer of Vaccinex, Inc., a
> biotechnology company, from May 2014 to January 2018. Prior to joining
> Vaccinex, Mr. Cobourn was the Vice President of Finance and Treasurer of Otsuka
> America Pharmaceutical, Inc., a private pharmaceutical company, from 2003 to
> April 2014, and served in other roles at Otsuka America Pharmaceutical from 1993
> to 2003. Prior to joining Otsuka America Pharmaceutical, Mr. Cobourn was a
> Certified Public Accountant at Hass & Company LLC, an accounting firm. Mr.
> Cobourn received a B.S. in business administration from Drexel University and is
> a Certified Public Accountant.

**Defendant Heller**

40.     Defendant Heller has served as the Company's Chief Medical Offer from April

2018 until he resigned in July 2020, effective August 2020. According to the 2020 Proxy

Statement, as of April 23, 2020, Defendant Heller beneficially owned 70,535 shares of the

Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on April 23, 2020 was $36.10, Defendant Heller owned approximately $2,546,314

worth of NextCure stock.

41.     For the year ended December 31, 2019, Defendant Heller received $505,294 in

compensation from the Company. This included $369,000 in salary, $133,488 in non-equity

incentive plan compensation, and $2,806 in all other compensation.

42.     The Company's 2020 Proxy Statement states the following about Defendant Heller:

> Kevin N. Heller, M.D. has served as our Chief Medical Officer since April 2018.
> He has also served as an Adjunct Professor at the Yale University School of
> Medicine since October 2018. Dr. Heller served as head of antibody clinical
> development at Incyte Corporation, a biotechnology company, from May 2015 to

April 2018 and as Global Medical Lead for the vandetanib program at AstraZeneca plc from May 2013 to May 2015. Prior to joining AstraZeneca plc, Dr. Heller served as an early clinical development lead for multiple programs, clinical strategy lead for ipilumumab, and global lead for oncology search and evaluation in the business development group at Bristol Myers Squibb Company from 2007 to 2013. Dr. Heller received a B.S. in molecular biophysics and biochemistry from Yale University and an M.D. from George Washington University.

**Defendant Jones**

43.     Defendant Jones has served as a Company director since December 2015. Defendant Jones also serves as the Chair of the Nomination and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 23, 2020, Defendant Jones beneficially owned 7,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Jones owned approximately $264,721 worth of NextCure stock.

44.     For the year ended December 31, 2019, Defendant Jones received $244,549 in compensation from the Company. Defendant Jones' compensation included $27,744 in fees earned or paid in cash and $216,805 in option awards.

45.     The Company's 2020 Proxy Statement states the following about Defendant Jones:

Dr. Jones served as Vice President, Worldwide Business Development and Senior Partner at Pfizer Ventures, where she was responsible for making and managing venture investments of strategic interest to Pfizer Inc., from December 2008 to April 2019. Prior to joining Pfizer, Dr. Jones was a General Partner with EuclidSR Partners. She began her private equity career in 1999 at S.R. One, GlaxoSmithKline's venture fund. Before that, she was Director of Scientific Licensing for SmithKline Beecham and a research scientist for SmithKline Beecham Pharmaceutical R&D. Dr. Jones has served on the board of directors of publicly traded CytomX Therapeutics, Inc., a clinical-stage biopharmaceutical company, since May 2019 (she also previously served on CytomX's board from December 2014 to June 2016) and Gritstone Oncology, Inc., an immuno-oncology company, since September 2019 and currently serves on the board of directors for various privately held companies and as a trustee of Juniata College. Dr. Jones previously served on the boards of directors of several publicly traded healthcare companies, including Mersana Therapeutics, Inc. from February 2015 to June 2018, Mirna Therapeutics, Inc. from December 2012 to June 2016, Aquinox Pharmaceuticals, Inc. from June 2010 to February 2015 and Flexion Therapeutics, Inc. from December 2009 to June 2014. Dr. Jones received a B.S. in biology from Juniata College and a Ph.D. in microbiology from the University of Pittsburgh.

**Defendant Kabakoff**

46.     Defendant Kabakoff has served as a Company director since December 2015. Defendant Kabakoff also serves as Chairman of the Board, and as a member of the Audit Committee and the Compensation Committee.

47.     According to the 2020 Proxy Statement, as of April 23, 2020, Defendant Kabakoff beneficially owned 83,573 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Kabakoff owned approximately $3,016,985 worth of NextCure stock.

48.     For the year ended December 31, 2019, Defendant Kabakoff received $266,808 in compensation from the Company.

49.     The Company's 2020 Proxy Statement states the following about Defendant Kabakoff:

> Dr. Kabakoff has served as Executive Partner at Sofinnova Investments, Inc. since May 2007 and became a founding Partner of HealthQuest Capital in 2012. Dr. Kabakoff has served on the board of directors of Castle Biosciences, Inc., a publicly traded company that develops and commercializes diagnostic and prognostic tests for dermatologic cancers, since September 2017, and currently also serves on the board of directors of several privately held life sciences companies, including Lineagen, Inc., where he serves as chairman, Dauntless Pharmaceuticals, Inc., Rainier Therapeutics, Neurana Pharmaceuticals, Biotheranostics, Inc., Rarecyte, Inc., and Antiva Biosciences, Inc. Dr. Kabakoff previously served as a director of several other publicly traded and privately held life sciences companies, including Principia Biopharma, Inc. from June 2016 to August 2018 in advance of Principia's September 2018 initial public offering, publicly traded InterMune, Inc. from November 2005 to September 2014, and Amplimmune. In 2001, Dr. Kabakoff co-founded Salmedix, Inc., a company that developed cancer drug treatments, and served as the company's Chairman and Chief Executive Officer and led its acquisition in June 2005 by Cephalon, Inc. Previously, Dr. Kabakoff served as Executive Vice President of Dura Pharmaceuticals, Inc., a pharmaceutical company, President and Chief Executive Officer of Spiros, a pharmaceutical company, Chief Executive Officer of Corvas International, Inc., a developer of biotherapeutics, and in senior executive positions with Hybritech, a biotechnology company. Dr. Kabakoff received a B.A. in chemistry from Case Western Reserve University and a Ph.D. in chemistry from Yale University.

**Defendant Khuong**

50.     Defendant Khuong has served as a Company director since January 2014. Defendant Khuong also serves as Chair of the Compensation Committee and as a member of the Nomination and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 23, 2020, Defendant Khuong beneficially owned 7,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Khuong owned approximately $264,721 worth of NextCure stock.

51.     For the year ended December 31, 2019, Defendant Khuong received $245,194 in compensation from the Company. Defendant Khuong's compensation included $28,389 in fees earned or paid in cash and $216,805 in option awards.

52.     The Company's 2020 Proxy Statement states the following about Defendant Khuong:

> Mr. Khuong has served as a Private Equity Partner at OrbiMed Advisors LLC, a venture capital and asset management firm, since 2003. Mr. Khuong currently serves as a director of several publicly traded life sciences companies, including BELLUS Health Inc. since December 2018, Synlogic, Inc. since February 2016, Inspire Medical Systems, Inc. since May 2014 and Aerpio Pharmaceuticals, Inc. since April 2014, and previously served as a director of publicly traded biopharmaceutical companies Nabriva Therapeutics plc (formerly Nabriva Therapeutics AG) from April 2015 to August 2017 and Otonomy, Inc. from August 2013 to July 2016 and as chairman of the board of directors of biopharmaceutical company Pieris Pharmaceuticals, Inc. from December 2014 to November 2017. Mr. Khuong has also served on the board of directors for several privately held companies. Mr. Khuong received a B.S. in molecular biology with concentration in biotechnology and a M.P.H. with concentration in infectious diseases from Yale University.

**Defendant Li**

53.     Defendant Li served as a Company director from January 2014 until September 10, 2020. Defendant Li also served on the Audit Committee. According to the 2020 Proxy Statement, as of April 23, 2020, Defendant Li beneficially owned 7,333 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Li owned approximately $264,721 worth of NextCure stock.

54.     For the year ended December 31, 2019, Defendant Li received $244,226 in compensation from the Company. Defendant Li's compensation included $27,421 in fees earned or paid in cash and $216,805 in option awards.

55.     The Company's 2020 Proxy Statement states the following about Defendant Li:

> Ms. Li has served as a Partner at Lilly Asia Ventures, which focuses on early- and growth-stage life sciences investments, since April 2015 and prior to that served as Principal at Lilly Asia Ventures from November 2013 to April 2015. Ms. Li has served as a director of publicly traded Gritstone Oncology, Inc., an immuno-oncology company, since September 2017 and holds board appointments at a variety of Lilly Asia Ventures' private portfolio companies, including Just Biotherapeutics, Inc. and Veritas Genetics Inc. From April 2014 to December 2017, she served on the board of Crown BioScience Inc., a biotechnology company that was publicly listed on the Taiwan Stock Exchange until it was acquired in December 2017. Prior to joining Lilly Asia Ventures, Ms. Li served as a senior business analyst at McKinsey & Company, worked in hospital administration at Partners Healthcare, and co-founded an interventional nephrology medical device venture. Ms. Li received a B.A. in biology from Harvard University and an M.B.A. from Harvard Business School.

**Defendant Morrison**

56.     Defendant Morrison has served as a Company director since January 2014. Defendant Morrison also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 23, 2020, Defendant Morrison beneficially owned 13,401 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 23, 2020 was $36.10, Defendant Morrison owned approximately $483,776 worth of NextCure stock.

57.     For the year ended December 31, 2019, Defendant Morrison received $248,613 in compensation from the Company. Defendant Morrison's compensation included $25,808 in fees earned or paid in cash and $216,805 in option awards.

58.    The Company's 2020 Proxy Statement states the following about Defendant

Morrison:

> Dr. Morrison has served as Chief Executive Officer of Syndax Pharmaceuticals, Inc., a publicly traded biopharmaceutical company, since June 2015, and as a member of its board of directors since July 2015. Dr. Morrison has also served as Executive Partner at MPM Capital, Inc. since June 2015. Dr. Morrison has served as a member of the board of directors of Arvinas, Inc., a publicly traded biopharmaceutical company focused on therapies to degrade disease-causing proteins, since June 2018 and prior to that as a member of its Scientific Advisory Board from August 2016 to June 2018. Before that, Dr. Morrison was the Chief Medical Officer and Head of Global Medicines Development at AstraZeneca plc from January 2012 to June 2015. Before joining AstraZeneca, Dr. Morrison held several positions at Pfizer Inc., including Head, Medical Affairs, Safety and Regulatory Affairs for Pfizer's human health business. Dr. Morrison also previously held several positions at Merck Research Laboratories, a division of Merck & Co., Inc., including Vice President, Clinical Sciences, Oncology. Dr. Morrison was a member of the executive committee of the Clinical Trials Transformation Initiative sponsored by the FDA and is on the board of the Alliance for Clinical Research Excellence and Safety. Dr. Morrison also serves on the board of directors for multiple private pharmaceutical companies. Dr. Morrison received a B.S. in biology from Georgetown University and an M.D. from the University of Connecticut Medical School. He completed residency training in internal medicine at Massachusetts General Hospital and a fellowship in medical oncology at the Dana-Farber Cancer Institute.

**Defendant Nicholson**

59.    Defendant Nicholson has served as a Company director since March 2020.

Defendant Nicholson also serves as a member of the Audit Committee. The Company's 2020

Proxy Statement states the following about Defendant Nicholson:

> Mr. Nicholson is currently retired. He has served as chairman of the board of directors of publicly traded biopharmaceutical company G1 Therapeutics, Inc. since September 2018, and on the board of directors of publicly traded biopharmaceutical companies Five Prime Therapeutics, Inc. since May 2017 and Turning Point Therapeutics, Inc. since January 2020. Mr. Nicholson also served on the board of directors of publicly traded biopharmaceutical company TESARO, Inc. from May 2015 until its acquisition by GlaxoSmithKline plc in January 2019. Mr. Nicholson also serves on the board of directors of several privately held life sciences companies. He served as president and chief executive officer of XTuit Pharmaceuticals, Inc., a biopharmaceutical company, from September 2015 to October 2016. Prior to that, he served as president, Pfizer Oncology, from May 2008 until March 2015, where he oversaw global commercialization and sales, clinical development, regulatory and business strategies. In addition to his oncology role, he was a member of Pfizer Inc.'s Portfolio Strategy and Investment

Committee, the governance body with oversight responsibility for the company's research and development. Prior to joining Pfizer, Mr. Nicholson worked in the oncology division of Eli Lilly and Company, where he held a number of leadership roles. Mr. Nicholson received a B.S. in pharmacy from the University of North Carolina, Chapel Hill, and an M.B.A. from the University of South Carolina, Columbia.

**Defendant Shannon**

60.     Defendant Shannon served on the Board from 2016 until March 25, 2020.

61.     For the year ended December 31, 2019, Defendant Shannon received $$248,420 in compensation from the Company. Defendant Shannon's compensation included $31,615 in fees earned or paid in cash and $216,805 in option awards.

62.     The IPO Registration Statement (defined below) stated the following about Defendant Shannon:

Timothy M. Shannon, M.D. has served as a member of our board of directors since December 2015. Dr. Shannon has served as aGeneral Partner at Canaan Partners since November 2009. Dr. Shannon has also served as the chairman of the board of directors at Arvinas, Inc., a publicly traded biopharmaceutical company focused on therapies to degrade disease-causing proteins, since July 2013. Dr. Shannon was the President and Chief Executive Officer of Aldea Pharmaceuticals, a biopharmaceutical company focused on the treatment of toxic aldehyde-related diseases, from November 2010 to September 2013. Dr. Shannon also served as Chief Executive Officer of CuraGen Corporation from 2007 to 2009 and as CuraGen's Chief Medical Officer from 2004 to 2007. From 1992 to 2002, Dr. Shannon served in various senior research and development roles at Bayer Healthcare, including Senior Vice President of Worldwide Clinical Development. Dr. Shannon previously served as a member of the boards of directors of publicly traded CytomX Therapeutics, Inc. from July 2012 to March 2017, Celldex Therapeutics, Inc. from October 2009 to December 2014 and CuraGen Corporation from September 2007 until its acquisition by Celldex in October 2009. Dr. Shannon received a B.A. in chemistry from Amherst College and an M.D. from the University of Connecticut.

We believe Dr. Shannon is qualified to serve on our board of directors due to his extensive experience in the venture capital industry, his executive leadership experience, his medical background and training and his service on the boards of other public and private biopharmaceutical companies.

**Defendant Webster**

63.    Defendant Webster has served as a Company director since April 2019. Defendant

Webster also serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement,

as of April 23, 2020, Defendant Webster beneficially owned 7,333 shares of the Company's

common stock. Given that the price per share of the Company's common stock at the close of

trading on April 23, 2020 was $36.10, Defendant Webster owned approximately $264,721 worth

of NextCure stock.

64.    For the year ended December 31, 2019, Defendant Webster received $249,065 in

compensation from the Company. Defendant Webster's compensation included $32,260 in fees

earned or paid in cash and $216,805 in option awards.

65.    The Company's 2020 Proxy Statement states the following about Defendant

Webster:

> Mr. Webster served as the Chief Financial Officer of Spark Therapeutics, Inc., a
> publicly traded biotechnology company, from July 2014 until its acquisition by
> Roche in December 2019. He was previously Senior Vice President and Chief
> Financial Officer of Optimer Pharmaceuticals, Inc., a publicly traded biotechnology
> company, from July 2012 until its acquisition by Cubist Pharmaceuticals, Inc. in
> October 2013. Prior to joining Optimer, Mr. Webster served as SVP and Chief
> Financial Officer of Adolor Corporation, a biopharmaceutical company, from 2008
> until its acquisition by Cubist Pharmaceuticals, Inc. in 2011. From 2007 until
> joining Adolor Corporation in 2008, Mr. Webster served as Managing Director,
> Investment Banking Division, Health Care Group for Broadpoint Capital Inc.
> (formerly First Albany Capital). Mr. Webster served as co-founder, President and
> Chief Executive Officer for Neuronyx, Inc., a biopharmaceutical company, from
> 2000 to 2006. Mr. Webster previously served in positions of increased
> responsibility, including as Director, Investment Banking Division, Health Care
> Group for PaineWebber Incorporated. Mr. Webster has served as a director of
> Nabriva Therapeutics AG (formerly Nabriva Therapeutics plc), a publicly traded
> biopharmaceutical company, since August 2016 and Viking Therapeutics, Inc., a
> publicly traded biopharmaceutical company, since May 2014. Mr. Webster
> received an A.B. in economics from Dartmouth College and an M.B.A. in finance
> from The Wharton School of the University of Pennsylvania.

**Defendant Xu**

66.     Defendant Xu has served as a Company director since November 2018. Defendant

Xu also serves as a member of the Nominating and Corporate Governance Committee. According

to the 2020 Proxy Statement, as of April 23, 2020, Defendant Xu beneficially owned 1,110,903

shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on April 23, 2020 was $36.10, Defendant Xu owned approximately

$40,103,598 worth of NextCure stock.

67.     For the year ended December 31, 2019, Defendant Xu received $249,065 in

compensation from the Company. Defendant Xu's compensation included $32,260 in fees earned

or paid in cash and $216,805 in option awards.

68.     The Company's 2020 Proxy Statement states the following about Defendant Xu:

Dr. Xu has served as Managing Director of Quan Capital, a life sciences venture
fund with officers in China and the United States, since August 2017. Prior to
joining Quan Capital, Dr. Xu served as Vice President and site head of Roche
Innovation Center Shanghai, and a member of the global management team for
Roche's Immunology, Inflammation & Infections Diseases Discovery and
Translation Area, from September 2012 to August 2017. Dr. Xu joined Roche from
McKinsey & Company. Dr. Xu has served as a director of Centrexion Therapeutics
Corporation, a biopharmaceutical company focused on the treatment of chronic
pain, since January 2018, a director of Tempest Therapeutics, Inc., a clinical stage
biotech company advancing small molecule cancer therapeutics, since February
2018, a director of Zidan Medical, Inc., a medtech start-up focusing on early stage
lung cancer, since November 2018 and a director of Walking Fish Therapeutics,
Inc., an early-stage biotech company, since June 2019. Dr. Xu previously served as
a director of ARMO BioSciences, Inc., a publicly traded late-stage
biopharmaceutical company focused on immuno-oncology, from August 2017 to
July 2018 when it was acquired by Eli Lilly and Company. Dr. Xu received a B.S.
in biophysics from Peking University and a Ph.D. in immunology from
Northwestern University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors, and/or fiduciaries of NextCure

and because of their ability to control the business and corporate affairs of NextCure, the Individual

Defendants owed NextCure and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage NextCure in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NextCure and its shareholders to benefit all shareholders equally.

70.     Each director and officer of the Company owes to NextCure and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NextCure, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of NextCure were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NextCure, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

74.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.     To discharge their duties, the officers and directors of NextCure were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NextCure were required to, *inter alia*:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Maryland, and the United States, and pursuant to NextCure's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how NextCure conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of NextCure and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NextCure's operations would comply with all applicable laws and NextCure's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.     Each of the Individual Defendants further owed to NextCure and the shareholders the duty of loyalty requiring that each favor NextCure's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

77.     At all times relevant hereto, the Individual Defendants were the agents of each other and of NextCure and were at all times acting within the course and scope of such agency.

78.     Because of their advisory, executive, managerial, and directorial positions with NextCure, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NextCure.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

81.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act and Section 11 of the Securities Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

82.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

83.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NextCure and was at all times acting within the course and scope of such agency.

## NEXTCURE'S CODE OF CONDUCT AND
## CODE OF ETHICS FOR PRINCIPAL OFFICERS

85.     Pursuant to the Code of Conduct the Company adopted its Code of Conduct to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- promote compliance with applicable laws, rules and regulations;

- promote the protection of Company assets, including corporate opportunities and confidential information;

- promote the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the code; and

- ensure accountability for adherence to the Code.

86.     The Code of Conduct "applies to all officers, directors and employees of the Company."

87.     The Code of Conduct provides, as to "Enforcement" of the Code of Conduct:

The Board shall be responsible for monitoring compliance with the Code and shall assess the adequacy of the Code periodically and approve any changes to the Code as may be recommended by the Audit Committee. The Board has designated the Senior Vice President, Corporate Development to be the compliance officer (the "Compliance Officer") for the implementation, interpretation and administration of the Code. In the event that employees 2 encounter an ethical issue where this Code or other Company policies do not expressly provide an answer, or in the event that employees encounter a situation where they believe a law, rule or regulation is unclear or conflicts with a provision of the Code, they are encouraged to contact a manager, supervisor, the Compliance Officer or any executive officer of the Company, or use one of the other resources described in the Code.

The Code will be strictly enforced. All managers and supervisors are required to enforce the Code and are not permitted to sanction or condone violations. There will be serious adverse consequences to any employee for non-adherence to the Code, which may include disciplinary action, up to and including termination, restitution, reimbursement or referral of the matter to the appropriate authorities. Discipline may also be imposed for conduct that is considered unethical or improper even if the conduct is not specifically covered by the Code.

88.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

A variety of laws apply to the Company and its operations. The Company requires that all employees comply with all laws, rules, and regulations applicable to the Company, both in letter and in spirit. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors. Employees are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to seek advice when there is any uncertainty. Any violations of laws, rules and regulations can result in civil and criminal penalties as well as disciplinary action from the Company.

89.     The Code of Conduct provides, as to "Conflicts of Interest," that:

Employees should always act in the best interest of the Company and not permit outside interests to interfere with their job duties. The Company prohibits all employees from using their position with the Company or the Company's relationship with its customers or any other external party with which the Company has a business relationship (each an "External Party," and, collectively "External

Parties") for private gain or to obtain benefits for themselves or members of their family.

For purposes of the Code, a potential conflict of interest occurs when an employee's outside interests (for example, financial or personal) interfere with the Company's interests or the employee's work-related duties. A conflict of interest can occur when an employee is in a position to influence a decision that may result in a personal gain for the employee or the employee's family member as a result of the Company's business dealings.

Any direct or indirect conflict of interest between the Company and any employee is prohibited unless otherwise consented to by the Company. The employee has a responsibility to the Company to disclose any situation that is, or reasonably could be expected to give rise to, a conflict of interest. If an employee, other than a director or an executive officer, feels that he or she may have a conflict of interest or a potential conflict of interest, such employee should discuss the matter with, and seek a determination and prior authorization or approval from, his or her supervisor or the Compliance Officer. A supervisor may not authorize or approve conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the Compliance Officer with a description of the activity and seeking the Compliance Officer's written approval. If the supervisor is involved in the potential or actual conflict, the matter should instead be discussed directly with the Compliance Officer. Conflicts of interest involving directors or executive officers must be referred to the Audit Committee for consideration. After receiving the Audit Committee's recommendations, the Board may approve, by a majority vote of disinterested directors, the resolution of a conflict of interest involving directors and executive officers.

90.     The Code of Conduct provides, as to "Honest and Ethical Conduct and Fair Dealing":

The Company is committed to achieving the highest standards of professionalism and ethical conduct in its operations and activities and expects its employees to conduct business according to the highest ethical standards of conduct, in addition to complying with all applicable laws, rules and regulations. The Company has an interest in maintaining a fair and competitive marketplace and friendly work environment. In order to achieve that standard, the Company expects its employees to maintain honest and ethical standards dealing with each other and the Company's competitors, as well as when transacting business with External Parties.

A. Employees must not take unfair advantage of anyone, including fellow employees, through the manipulation, concealment or abuse of privileged information, misrepresentation of material facts or any other intentional unfair-dealing practice.

B. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent.

C. In addition to the maintenance of honest and ethical standards in disseminating information, employees must gather information about other companies and organizations, including competitors, using appropriate methods. Stealing proprietary information, knowingly possessing trade secret information that was obtained without the owner's consent or inducing such disclosures by past or present employees of other companies is prohibited.

D. Each employee should endeavor to respect the rights of and deal fairly with the Company's External Parties, competitors and employees.

91.      The Code of Conduct provides, as to "Public Communication," that:

The Company must monitor public communication about the Company in order to maintain credibility and a positive reputation in the community. News media can have a direct impact on the Company's profitability and its ability to achieve its mission. The Company's policy is to provide timely, accurate and complete information in response to media inquiries consistent with its obligations to maintain the confidentiality of proprietary information and to prevent selective disclosure of market-sensitive financial and other material information in accordance with the Company's Regulation FD policy. In accordance with such policy, employees must direct any news media or public requests for information to the Company's Disclosure Compliance Officer, who will assist in evaluating the inquiry and creating an appropriate response to the request. Only authorized employees may make any public statements on behalf of the company, whether to the media, investors or in other external forums, including on the Internet. This includes disclosing new or confidential information through social media applications and websites.

92.      The Code of Conduct provides, as to "Reporting With Integrity," that:

The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations. The Company must also maintain a system of internal accounting controls that meet applicable laws, rules and regulations, and prepare financial statements in accordance with generally accepted accounting principles and applicable laws, rules and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, the President and Chief Operating Officer, the Chief Financial Officer, the principal accounting officers and persons performing similar functions) must conduct themselves using high ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements and to prepare financial reports and financial statements that are not false or misleading, and that

present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.

A. No employee, officer or director may override, or direct others to override, the Company's established system of internal controls over financial reporting and disclosure.

B. No fund, asset or liability of the Company which is not fully and properly disclosed and recorded on the Company's books and records shall be created or permitted to exist.

C. Transactions of the Company are to be executed only in accordance with management's general or specific authorizations.

D. No false, artificial or misleading entries may be made in the books and records of the Company for any reason and no employee may engage in any arrangement that results in such prohibited act.

E. No transaction shall be effected and no payment on behalf of the Company may be approved or made with the intention or understanding that any part of the transaction or payment is to be used for any purpose other than that described by the documents supporting the transaction or payment.

F. Any uncertainty by an employee about judgments concerning accounting or tax matters should be discussed with a superior; when in doubt, ask for guidance.

G. No one shall take any action to fraudulently influence, coerce, manipulate or mislead any internal or external auditor engaged in the performance of an audit of the Company's financial statements.

93.     Finally, the Code of Conduct provides, as to "Reporting Suspected Non-Compliance/Whistleblower Hotline," that:

**A. Reporting**

The Company supports an open and honest atmosphere in which questions should be asked, and potential problems or concerns must be raised. Any employee who becomes aware of an existing or potential violation of this Code, or any applicable laws, rules, regulations, Company policies or the Code, suspected fraudulent activity or any concerns or complaints regarding accounting, internal accounting controls or auditing matters should be promptly reported either openly or on an anonymous basis. Employees may report any such violations orally or in writing to the Compliance Officer or chairman of the Audit Committee or through the Company's Whistleblower Hotline pursuant to the Company's Whistleblower Policy.

**B. Investigations**

The Company is committed to taking prompt and consistent action, as appropriate, in response to suspected or reported violations of the Code, of any law, rule, regulation or Company policy. All employees are required to cooperate fully with internal investigations by providing complete and truthful information in a timely manner. The Company will not tolerate retaliation 10 against individuals for raising good faith possible violations of the Code, any applicable law, rule or regulation, or Company policy.

94.     The Company has also adopted a Code of Ethics for Principal Officer (the "Code of Ethics") which applies to NextCure's "principal executive officer, principal financial officer[]" and to members of the Company's Disclosure Committee. Pursuant to the Code of Ethics.

95.     Pursuant to the Code of Ethics, the Individual Defendants, particularly those who served as officers of the Company, were required to:

A. always act with the highest standards of personal and professional integrity, carry out your responsibilities honestly and with integrity, exercise at all times your best independent judgment and not tolerate others who attempt to deceive, or evade responsibility for actions;

B. avoid situations in which your own interests conflict with the interests of the Company. In any case in which you find yourself with an actual or apparent conflict of interest, you must promptly disclose it to the Audit Committee of the Board of Directors of the Company (the "Board"), which will review the transaction or relationship and determine how the situation should be resolved;

C. comply with the Company's disclosure controls, policies and procedures, which have been designed to ensure that the information required to be disclosed by the Company in its SEC filings is collected, processed, summarized and disclosed in a timely fashion and accumulated and communicated to the appropriate persons;

D. carefully review drafts of reports and other documents the Company files with or furnishes or submits to the SEC before they are filed or submitted, and Company press releases or other public communications before they are released to the public, with particular focus on disclosures you do not understand or agree with and on information known to you that is not reflected in the report, document, press release or public communication [.]

96.     In violation of the Code of Conduct and Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Misappropriation

Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law and breaches of their fiduciary and other duties.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

97.   NextCure is a clinical-stage biopharmaceutical company that discovers and develops immune-oncology[1] therapies, which restore an impaired immune system by detecting and killing cancerous cells. The Company has yet to recognize any revenues from its product candidates, and its sole source of revenue was attributable to the Lilly Agreement, a multi-year research collaboration agreement with Lilly involving NextCure's FIND-IO platform that the Company entered into in November 2018, detailed below.

98.   During the Relevant Period, NextCure boasted that it had a "novel," "unique," and "proprietary" discovery platform, FIND-IO, which the Company credited for allowing it to identify "multiple novel targets," including S15, the target of NextCure's most advanced treatment candidate, NC318.

99.   S15 suppresses the proliferation of T cells[2] and negatively regulates T cell function. In other words, S15 shuts down the immune system's response to foreign cells. NC318 was designed to block S15 from suppressing immunity and would restore T cell function and anti-tumor immunity in the tumor microenvironment ("TME").

---

[1] Immune-oncology is the study and development of treatments that use the immune system to fight cancer.
[2] T cells are one of the white blood cells in the immune system and play a role in the immune response.

***The Misappropriation Misconduct***

100.    FIND-IO was purportedly developed by NextCure's co-founder, Dr. Lipeing Chen ("Dr. Chen"), who has been credited with discovering the immunosuppressive properties of S15 (the target of NC318), using a predecessor of the FIND-IO platform. The platform "applies a function-based screening approach to identify human proteins and to determine whether those proteins alter or stop an immune response resulting in immune evasion."

101.    FIND-IO was also the foundation of the Company's 2018 multi-year collaboration agreement with Lilly, the ***sole source*** of the Company's revenues. Pursuant to the Lilly Agreement, NextCure would use the FIND-IO platform to identify new oncology targets for collaborative research and drug discovery by the two companies. Lilly had the exclusive option to obtain global exclusive licenses to research, development, manufacture, and commercialize therapies for the oncology targets that the companies identified. This collaboration with Lilly provided NextCure with an upfront cash payment of $25 million and a $15 million equity investment, and other quarterly research and development support and milestone payments in an aggregate of up to $1.4 billion, as well as royalty payments.

102.    However, in 2013—two years before co-founding NextCure with Dr. Chen— Defendant Richman had been recruited to help build Immunaccel, which had a "three-dimensional platform designed to study the tumor microenvironment in cancer research."

103.    In 2016, Defendant Richman caused NextCure to enter into a Contract Services Agreement as a customer of Immunaccel because of the companies' "mutual focus on immune-oncology and Immunaccel's 3D technology." At the time, Defendant Richman served on the Board of Managers at Immunaccel.

104.    NextCure became a customer of Immunaccel in 2016 because of their "mutual focus [on] immune-oncology and Immunaccel's 3D technology." The two companies entered into a Contract Services Agreement and Defendant Richman, in his capacity as NextCure's CEO, began to receive confidential information about Immunaccel's 3D assays and its 3D platform. Thereafter, Defendant Richman used this confidential information in the development of NextCure's own purportedly unique platform, essentially duplication Immunaccel's 3D technology, and marketing itself in direct competition with Immunaccel. While contractually obligated, Defendant Richman failed to disclose NextCure's use of 3D assays for drug screening and product evaluation and only resigned in July 2019.

105.    Defendant Richman's access to Immunaccel's trade secrets enabled the Individual Defendants to establish and tout the Company's "novel" product platform, which opened doors of opportunity for the Individual Defendants to market the Company and conduct two public offerings within a matter of months and to enter into the lucrative Lilly Agreement. The Misappropriation Misconduct involved NextCure's core operations and could not have escaped the Individual Defendants' notice had they been appropriately undertaking their responsibilities. The Individual Defendants' knowledge may thus be inferred due to their positions with the Company, their access to Defendant Richman and the Company's material arrangements with Immanuccel and later with Lilly before and throughout the Relevant Period.

106.    In 2019, the Company began gearing up for its IPO. Notably, the Company's discovery platform, which was supposedly "based on the immunocological expertise of [its] management team and the scientific leadership of [its] scientific founder[]" was a highlighted feature of NextCure's IPO related documents. Indeed, according to the Company's

representations, FIND-IO enabled it to discover "the immunosuppressive properties of S15[,]" the target of NextCure's first and primary product candidate, NC318.

### The True Efficacy of NC318 and the Company's IPO

107.    Before the IPO, in October 2018, NextCure started the Phase 1/2, Open-Label,[3] Dose-Escalation, Safety and Tolerability Study of NC318 in Subjects with Advanced or Metastatic Solid Tumors (the "Phase 1 Study"), to test NC318 in patients with certain cancers. This trial was designed only to assess whether NC318 was safe and tolerable, and to define the maximum dose or pharmacologically active dose and to assess preliminary efficacy.

108.    NC318 was the Company's only product candidate to reach clinical testing, and the Company touted it for its potential to treat multiple cancer indications (i.e., multiple tumor types). The Company also boasted that it expected that NC318 would help the nearly 60-70% of cancer patients who did not respond to cancer therapies that target PD-1/PD-L1, because the expression of S15 and PD-L1 generally appeared not to overlap in tumors.

109.    By March 31, 2019, the Company had dosed 21 patients and reported that NC318 was "well tolerated," with no drug-related severe adverse events or dose limiting toxicities observed. Of the 21 patients, 13 could be evaluated for efficacy. This meant that 13 of the 21 patients at least one "on-treatment" radiologic assessment. Of the 13 patients, NextCure observed that one lung cancer patient had a confirmed partial response, six patients had stable disease, and six patients had disease progression. The patient with the partial response was a lung cancer patient that came from a particular cohort.

---

[3] Open-label trials allow participants and researchers to know which treatment a patient is receiving and about outcomes, during and throughout the trial.

110.    Although the trial provided mixed results, the Individual Defendants only released the positive aspects of the trial to the public, to maintain an illusion that NC318 could effectively treat a range of tumor types. Notably, at all relevant times, the Individual Defendants had access to clinical trial results and updates on clinical date.

111.    On April 12, 2019, NextCure filed a registration statement with the SEC on a Form S-1, which was declared effective on May 8, 2019 after several amendments (the Form S-1 and all amendments thereto are referred to as the "IPO Registration Statement") as part of its IPO. On May 9, 2019, the Company filed a prospectus for the IPO on Form 424B4 (the "IPO Prospectus" and together with the IPO Registration Statement, the "IPO Offering Documents").

112.    NextCure offered 5.75 million shares of NextCure common shares for $15 per share, including shares sold after the underwriters for the IPO fully exercised their options. The Company generated approximately $86.25 million in gross offering proceeds in the IPO, which closed on May 13, 2019.

113.    As detailed below, the IPO Offering Documents misleadingly touted that NextCure was finding new targets for development using a "proprietary," "novel" platform and NextCure's "immunology knowledge, experience, capabilities and tools [] developed" by the Company and Dr. Chen over time. The IPO Offering Documents enabled investors to believe in the prospects of the Company, based on its much-touted "unique" platform and the possibilities surrounding NC318.

**_The Individual Defendants Selectively Disclose Clinical Data to Prime the Market for the SPO_**

114.    Right before the SPO, on November 5, 2019, NextCure released an abstract about its Phase 1 Study through the Society of Immunotherapy of Cancer (the "Abstract"). The Abstract stated that 43 patients had received doses of NC318 across six dose cohorts with advanced solid

tumors, including ten Non-Small Cell Lung Cancer ("NSCLC"), seven ovarian, six melanoma, three breast, and three colorectal cancer patients. According to the Abstract, NC318 had been well tolerated and tumor responses were evaluable in 32 patients with single agent activity seen in NSCLC patients, in particular, including a patient who achieved complete remission (i.e., "a complete response"), another who experienced tumor shrinkage (i.e., "a partial response") and three patients whose diseases appeared not to have worsened. Accordingly, with two of seven NSCLC patients experiencing a significant change, NextCure observed a "29% overall response rate (ORR)," and reported an "overall disease control rate (DCR) of 71%."

115.    However, at the time the Abstract was released, NextCure already had additional data on 25 more evaluable patients, including three NSCLC patients who showed no positive results from their NC318 treatment. This meant that for NSCLC, the most commercially significant market of patients, the ORR was actually 15%, and the DCR was actually 46%. These realities flew in the face of Defendants' promulgations of NC318's commercial and therapeutic potential.

116.    The Food and Drug Administration ("FDA") approves drugs based on outcomes represented by evidence from clinical benefits, such as improved overall survival. However, the results presented in the Abstract selectively disclosed evidence only of the tumor results, which frequently does not translate into clinical benefits. The FDA has explained that, "Treatment effects on ORR have not been demonstrated to reliably predict corresponding effects on survival in NSCLC." Therefore, the FDA has only relied on ORR to approve drugs that treat NSCLC when the overall response rate is high, from 33%-66%. The ORR for NC318 was only 15% (incorporating all available trial data), which is far below the range of ORR that the FDA would approve for NSCLC. Further, there were only ten patients in the NSCLC trial, and the trial had a

95% confidence interval and a lower bound of zero, meaning the study could find the NC318 had no effect at all.

117.    Moreover, the two NSCLC patients who showed positive responses had not been biopsied prior to their NC318 treatment. As such, NextCure could not have known whether they were actually part of the patient population for which they would seek FDA approval. In other words, even the two positive responses were not as encouraging as the Company made it seem to investors. The FDA has also warned that "disease progression and tumor responses" based on "subjective interpretation of radiographic images" have the "potential to introduce bias, particularly when evaluated in open-label trials."

118.    Moreover, the study protocol was such that positive responses could have been due to prior treatment, as the study allowed patients to enroll who had recently received other cancer treatments; patients could be enrolled if they had received chemotherapy at least 15 days before receiving the first dose of NC318, or had received a prior monoclonal antibody at least 29 days before receiving the first dose of NC318. The results were also not "durable" because there was not enough time to determine durability, and the lack of progress of tumors among some of the NSCLC patients was not evidence of efficacy, according to the FDA.

119.    However, given the Defendants' confidence and misleading portrayal of the results, *The Motley Fool* published an article on November 5, 2019, stating that NextCure's "stock took off like a rocket" that day "when investors learned that one patient achieved complete remission, another experienced tumor shrinkage, and three more haven't gotten any worse."[4] The article further explained:

---

[4] Cory Renauer, "Here's Why NextCure Stock Blew Through the Roof Tuesday," *The Motley Fool*, https://www.fool.com/investing/2019/11/05/heres-why-nextcure-stock-blew-through-the-roof-tod.aspx. Last visited Mar. 16, 2021.

Third-quarter sales of Merck & Co.'s (NYSE:MRK) Keytruda jumped 62% year over year to an annualized $12.4 billion, even though the drug only helps some patients. Expectations for NextCure and NC318 are soaring because S15-positive tumors tend to be PD-L1-negative, and NC318 could become as popular as Keytruda if clinical trial results continue to impress.

120.   Defendant Heller stated in a press release and on an analyst call on November 9, 2019, that he was encouraged by these results.

### NextCure's Secondary Offering

121.   On November 12, 2019, NextCure filed a Form S-1 draft registration statement for its SPO (the "SPO Registration Statement"). On November 14, 2019, the SPO was priced, and on November 18, 2019, NextCure filed the final prospectus for the SPO (the "SPO Prospectus," and together with the SPO Registration Statement, the "SPO Offering Documents"). In the SPO, NextCure offered 4,077,192 shares of common stock for $36.75 per share. The underwriters of the SPO had an option to exercise up to 4,688,770 shares. The Company raised $172.2 million in gross proceeds in the SPO.

122.   The Individual Defendants were successful in their goal to artificially boost NextCure's revenues and perceived standing before the IPO and thereafter, through concealing material information from investors, but at the expense of the Company's long-term prospects and operations. Without a novel platform, which was the basis of the Company's collaboration with Lilly, (the sole source of any revenues recognized by the Company) and successful clinical trials of its leading treatment candidate, NC318—NextCure's only product candidate to reach clinical testing—the future of the Company would be at risk. Inevitably, the Individual Defendants' scheme would catch up with them.

123.   Throughout the Relevant Period, the Individual Defendants continued to make materially false or misleading statements and omissions in press releases, investor conference

calls, and in reports filed with the SEC, about the Company's business, internal controls, and

risks to which the Company was subjected, as set forth below.

## False and Misleading Statements

### *IPO Offering Documents*

124.    On May 8, 2019 and May 9, 2019, the Company filed the IPO Offering Documents.

According to the IPO Offering Documents, "[t]he success of [NextCure's] business depends in

part upon [its] ability to identify targets based on our proprietary FIND-IO platform and to develop

and commercialize immunomedicines. Our approach to the discovery of targets using [its

"proprietary"] FIND-IO platform is novel." The IPO Offering Documents further explained that

NextCure used its "immunology knowledge, experience, capabilities and tools we have developed,

including our FIND-IO platform" stating in relevant part:

> Our approach to identifying targets for new immunomedicines is based on our
> FIND-IO platform. FIND-IO embodies a rational approach to the discovery of
> novel cell surface and secretory molecules that drive functional immune responses.
> *We use our immunology knowledge, experience, capabilities and tools we have*
> *developed, including our FIND-IO platform*, to support our discovery efforts.

125.    Indeed, according to Defendants, since its founding in 2015, NextCure has

> developed, industrialized and optimized our FIND-IO platform based on the
> immunological expertise of our management team and the scientific leadership of
> our scientific founder, Dr. Lieping Chen. Our approach in creating the FIND-IO
> platform, and how we apply it, reflects our belief in the importance of
> understanding biological pathways of all cells in the immune system and restoring
> normal immune function. The platform uses our proprietary approaches to assess
> the suppressive or stimulatory function of immune pathways in T cells and other
> immune cells[.]

126.    Regarding the creation and application of the FIND-IO platform, the IPO Offering

Documents stated:

> Our approach in creating the FIND-IO platform, and how we apply it, reflects our
> belief in the importance of understanding biological pathways of all cells in the
> immune system and restoring normal immune function. The platform uses *our*
> proprietary approaches to assess the suppressive or stimulatory function of immune

pathways in T cells and other immune cells, as measured by effects on proliferation or induction of molecules known to impact immune responses, such as cytokines, which are signaling molecules secreted by cells in the immune system that mediate and regulate immunity and inflammation. We study primary immune cells from healthy donors and from patients with various diseases, as well as established cell lines from immune and non-immune cell lineages, including T cell subsets, monocytes, macrophage subpopulations and cancer cell lines. In oncology, we are using the FIND-IO platform to discover immunomedicines with the potential to intervene or modulate interactions of immune cells within the TME to restore anti-tumor activity.

* * *

Our FIND-IO platform is the result of our industrialization, expansion and optimization of a predecessor platform that Dr. Chen used to discover the immunosuppressive properties of S15. Our FIND-IO platform applies a function based screening approach to identify human proteins and to determine whether those proteins alter or stop an immune response resulting in immune evasion.

* * *

***To create our FIND-IO platform, we industrialized, expanded and optimized the T Cell Activity Array, or the TCAA, a predecessor of the FIND-IO platform that Dr. Chen used to discover the immunosuppressive properties of S15.*** Our work in developing the FIND-IO platform beyond the TCAA includes using different and expanded gene libraries, adding biological pathways and reporters, expanding immune cell types and, most importantly, increasing the repertoire of functional assay readouts. We also broadened the platform to look at signaling within both the immune cell and the cell expressing the library gene. By transfecting cells with library genes, which encode membrane-bound or soluble proteins, FIND-IO is designed to determine whether the genes have signaling functions when interacting with an immune cell.

Our FIND-IO technology includes proprietary approaches to functionally assess immune pathways in both primary immune cells and established cell lines from immune lineages, including T cell subsets, monocytes, macrophage subpopulations, dendritic cells, cancer cell lines and cells isolated from diseased patients.

127.    The IPO Offering Documents also explained that:

[the Company's] commercial success depends in part on our ability to obtain and maintain proprietary protection for our products, methods and manufacturing processes, to operate without infringing the proprietary rights of others and to prevent others from infringing our proprietary rights. We rely on a combination of patent applications and trade secrets, as well as contractual protections, to establish and protect our intellectual property rights.

128.    The IPO Offering Documents further noted that NextCure:

- 40 -

*[relies] upon trade secrets, know-how and continuing technological innovation to develop and maintain our competitive position, including with respect to our FIND-IO platform.* We seek to protect our proprietary technology and processes, in part, by confidentiality and invention assignment agreements with our employees, consultants, scientific advisors and other contractors. In addition, in the ordinary course of our business, we enter into agreements with other third parties for non-exclusive rights to intellectual property directed to other technologies that are ancillary to our business, including laboratory information management software and research and development tools.

129.    The IPO Offering Documents maintained that, "Through [NextCure's] *proprietary* Functional, Integrated, NextCure Discovery in Immuno-Oncology, or FIND-IO, platform, we study various immune cells to discover and understand targets and structural components of immune cells and their functional impact in order to develop immunomedicines."

130.    Further, the IPO Offering Documents stated that NextCure's "approach to identifying targets for new immunomedicines in cancer is based on the combination of our FIND-IO platform, our immunological expertise and our belief in the importance of understanding biological pathways and the normal function of the immune system in the TME."

131.    The IPO Offering Documents also touted that the Company's platforms, technology, and knowledge provided a competitive advantage:

The biotechnology and pharmaceutical industries, and the immuno-oncology subsector, are characterized by rapid evolution of technologies, fierce competition and strong defense of intellectual property. We believe that our programs, platforms, technology, knowledge, experience and scientific resources provide us with competitive advantages, but we also face competition from pharmaceutical and biotechnology companies, academic institutions, governmental agencies and public and private research institutions, among others. Our competitors include larger and better funded biopharmaceutical, biotechnology and therapeutics companies, including companies focused on cancer immunotherapies, such as Amgen, Inc., AstraZeneca plc, Bristol-Myers Squibb Company, or BMS, Genentech, Inc., GlaxoSmithKline PLC, Merck & Co., Inc., Novartis AG, Pfizer Inc., Roche Holding Ltd and Sanofi S.A. Moreover, we may also compete with smaller or earlier-stage companies, universities and other research institutions that have developed, are developing or may be developing current and future cancer therapeutics.

132.    Finally, the IPO Offering Documents stated that NextCure "tr[ies] to ensure that our employees, consultants and advisors do not use the proprietary information or know-how of others in their work for us."

133.    The IPO Offering Documents also enumerated warnings to investors of certain general risks, and of risks that had actually already come to pass, including that "many of [NextCure's] employees, consultants or advisors are currently, or were previously, employed at universities or other biotechnology or pharmaceutical companies, including [its] competitors or potential competitors," and that the Company "may," in the future, be subject to "claims asserting that [NextCure's] employees, consultants or advisors have wrongfully used or disclosed alleged trade secrets of their current or former employers." The IPO Offering Documents stated that these risks "may" increase as its "product candidates approach commercialization and as [NextCure] gains greater visibility as a public company."

134.    Additionally, regarding NextCure's use of the FIND-IO platform to discover and develop product candidates, the IPO Offering Documents maintained:

> If we uncover any previously unknown risks related to our FIND-IO platform, or if we experience unanticipated problems or delays in developing our FIND-IO product candidates, we may be unable to achieve our strategy of building an oncology pipeline of novel targets for new immunomedicines focused on nonresponders, or meet our obligations under the Lilly Agreement.

135.    The IPO Offering Documents also explained that third parties "***may*** initiate legal proceedings alleging that we are infringing their intellectual property rights":

> Our commercial success depends upon our ability and the ability of any collaborators to develop, manufacture, market and sell our product candidates and use our proprietary technologies without infringing the proprietary rights and intellectual property of third parties. We cannot provide any assurances that third-party patents do not exist which might be enforced against our current manufacturing methods, product candidates or future methods or products, resulting in either an injunction prohibiting our manufacture or sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

The biotechnology and pharmaceutical industries are characterized by extensive and complex litigation regarding patents and other intellectual property rights. *We may in the future become party to, or be threatened with, adversarial proceedings or litigation regarding intellectual property rights with respect to our product candidates and technology*, including post grant review and inter partes review before the USPTO. The risks of being involved in such litigation and proceedings may also increase as our product candidates approach commercialization and as we gain greater visibility as a public company. Third parties may assert infringement claims against us based on existing patents or patents that may be granted in the future, regardless of their merit. There is a risk that third parties may choose to engage in litigation with us to enforce or to otherwise assert their patent rights against us. Even if we believe such claims are without merit, a court of competent jurisdiction could hold that these third-party patents are valid, enforceable and infringed, which could materially and adversely affect our ability to commercialize any of our product candidates or technologies covered by the asserted third-party patents.

If we are found to infringe a third party's valid and enforceable intellectual property rights, we could be required to obtain a license from such third party to continue developing, manufacturing and marketing our product candidates and technology. However, we may not be able to obtain any required license on commercially reasonable terms or at all. Even if we were able to obtain a license, it could be non-exclusive, thereby giving our competitors and other third parties access to the same technologies licensed to us, and it could require us to make substantial licensing and royalty payments. We could be forced, including by court order, to cease developing, manufacturing and commercializing the infringing technology or product candidates. In addition, we could be found liable for monetary damages, including treble damages and attorneys' fees, if we are found to have willfully infringed a patent or other intellectual property right. A finding of infringement could prevent us from manufacturing and commercializing our product candidates or force us to cease some of our business operations, which could materially harm our business. *Claims that we have misappropriated the confidential information or trade secrets of third parties could have a similar negative impact on our business, financial condition, results of operations and prospects.*

136.    Under the heading "Others may claim an ownership interest in our intellectual property and our product candidates, which could expose us to litigation and have a significant adverse effect on our prospects," the IPO Offering Documents purported to warn investors:

While we are presently unaware of any claims or assertions by third parties with respect to our patents or other intellectual property, we cannot guarantee that a third party will not assert a claim or an interest in any of such patents or intellectual property. For example, a third party may claim an ownership interest in one or more of our, or our licensors', patents or other proprietary or intellectual property rights. A third party could bring legal actions against us to seek monetary damages

or enjoin clinical testing, manufacturing or marketing of the affected product candidate or product. If we become involved in any litigation, it could consume a substantial portion of our resources and cause a significant diversion of effort by our technical and management personnel. If any such action is successful, in addition to any potential liability for damages, we could be required to obtain a license to continue to manufacture or market the affected product candidate or product, in which case we could be required to pay substantial royalties or grant cross-licenses to patents. We cannot, however, assure you that any such license would be available on acceptable terms, if at all. Ultimately, we could be prevented from commercializing a product, or forced to cease some aspect of our business operations as a result of claims of patent infringement or violation of other intellectual property rights. Further, the outcome of intellectual property litigation is subject to uncertainties that cannot be adequately quantified in advance, including the demeanor and credibility of witnesses and the identity of any adverse party. This is especially true in intellectual property cases, which may turn on the testimony of experts as to technical facts upon which experts may reasonably disagree. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations or prospects.

137.    Regarding NextCure's competition, the IPO Offering Documents purported to warn

investors that:

The biotechnology industry is intensely competitive and subject to rapid and significant technological change. Our current or future product candidates may face competition from major pharmaceutical companies, specialty pharmaceutical companies, universities and other research institutions and from products and therapies that currently exist or are being developed, some of which products and therapies we may not currently know about. Many of our competitors have significantly greater financial, manufacturing, marketing, product development, technical and human resources than we do.

138.    Moreover, regarding NextCure's competitors, the IPO Offering Documents

warned:

Our competitors may also develop drugs or discovery platforms that are more effective, more convenient, more widely used or less costly than our product candidates or our FIND-IO platform or, in the case of drugs, have a better safety profile than our product candidates. These competitors may also be more successful than us in manufacturing and marketing their products, and have significantly greater financial resources and expertise in research and development.

There are a large number of companies developing or marketing treatments for cancer, including many major pharmaceutical and biotechnology companies. Currently marketed oncology drugs and therapeutics range from traditional cancer therapies, including chemotherapy, to antibody-drug conjugates, such as

Genentech's Kadcyla, to immune checkpoint inhibitors targeting CTLA-4, such as BMS' Yervoy, and PD-1/PD-L1, such as BMS' Opdivo, Merck & Co.'s Keytruda and Genentech's Tecentriq, to T cell-engager immunotherapies, such as Amgen's Blincyto.

139.    Finally, regarding NextCure's competition, the IPO Offering Documents stated that:

> Smaller and other early stage companies may also prove to be significant competitors. These third parties compete with us in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our current and future product candidates. In addition, the biopharmaceutical industry is characterized by rapid technological change. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our product candidates obsolete, less competitive or not economical.

***November 5, 2019 Abstract***

140.    On November 5, 2019, NextCure released the Abstract detailing that 43 patients with advanced solid tumors had been dosed with NC318 across six dose cohorts (8mg-800mg, every two weeks), including 10 NSCLC patients, 7 ovarian patients, 6 melanoma patients, 3 breast patients and 3 colorectal patients. According to the Abstract, NC318 had been well tolerated. Moreover, tumor responses purportedly evaluable in 32 patients, with single agent activity seen in NSCLC patients. The Abstract maintained that one NSCLC had achieved complete remission, while another experienced a partial response, with tumor shrinkage. Three patients' diseases appeared not to have worsened. As 2 of 7 NSCLC patients apparently experienced a significant change, NextCure observed a "29% overall response rate (ORR)," and reported an "overall disease control rate (DCR) of 71%."

141.    In response to these selectively positive (and incomplete) results, the Company's stock price ballooned almost 250%. In truth, the study's ORR was actually 15% and its DCR was 46% for patients with NSCLC.

***November 9, 2019 Press Release***

142.   On November 9, 2019, the Company issued a press release, reiterating the Individual Defendants' misleading message that the NC318 study results were positive. The press release quoted Defendant Heller, who stated that it was "encouraging to see single-agent activity among NSCLC patients' refractory to PD-1 therapies, including a durable complete response and a durable partial response." Defendant Heller continued that, "the results to date support the potential of NC318 to block S15-mediated immune suppression among a patient population unlikely to respond to PD-1/PDL1- directed therapies." Likewise, Defendant Richman, as quoted in the press release, credited "initial anti-tumor activity with NC318" for "reinforc[ing] [NextCure's] belief that NC318 has the potential to be a new therapy for patients with solid tumors and low levels of PD-L1 expression or who do not response to current anti-PD-1/PD-L1 treatments."

143.   Defendant Richman also reaffirmed the importance of the FIND-IO platform, stating: "These findings also revalidate the importance of the approach of our FIND-IO™ discovery platform in identifying targets like S15 that can impact immune function."

***November 9, 2019 Analyst Call***

144.   The Individual Defendants continued to tout the efficacy of NC318, stating during an analyst call on November 9, 2019:

> NC318, I believe has shown some very encouraging promise here as a single agent activity. We would not and we have not expected to see any clinical responses in PD-1 refractory patients. But we were fortunate enough to have two that were confirmed with deepening and improving responses along the way. Stable disease was observed for greater than six months in multiple other tumor types.
>
> * * *
>
> We also are of course very encouraged by the confirmed responses in non-small cell lung, a couple of stable diseases that we saw in ovarian, head and neck, and breast.

- 46 -

145.    Defendant Heller also discussed the design of the Phase 1 Study, which provided

the "very strong" evidence of NC318's promise in PD-1 refractory NSCLC patients:

> [I]t was a pretty standard three plus three design. We looked at a wide breadth of
> dose levels. And one of the things that we did in order to manage efficiency to
> enroll quickly [while] also trying to get as much data as possible is that we made
> the biopsies for the first three patients in each dose cohort option[al], which means
> we didn't very often get biopsies. But then as we backfilled in order to collect
> additional data, we made those biopsies requirement because we did want to
> emphasize our commitment to biomarker research. Eligibility. We really want to
> point out here that of course this was all comer[s]. This was independent PD-L1 or
> Siglec-15 status. So we were not optimizing the phase 1 component to look for
> efficacy. Phase 1, and the objective of phase 1 is all about safety and tolerability
> and collecting as much data as possible so you can make a good educated guess for
> a recommended phase 2 dose.
>
> * * *
>
> And then I will have a little bit more discussion regarding the phase 2 plan. But it's
> a Simon 2-Stage design, subject tumors must be PD-L1 TPS score of less than 50%
> in our phase 2 component. And the rational for that is because of a non-overlapping
> expression pattern of PD-L1 and Siglec-15. So it is a means by which we could
> softly enrich for patients with Siglec-15 expression.
>
> But then what we're going to do is we'll check for Siglec-15 expression
> retrospectively and we'll stratify as necessary.
>
> And part of the reasons we designed it in that manner was that right now we have
> some preliminary data that suggests very strongly that this is active among patients
> who have PD-1 refractory non-small cell lung cancer.

146.    Analysts responded with overwhelming positivity, issuing high price targets for the

Company's stock and reporting on the impressive, "compelling and supportive" NC318 data and

the Company's related "large market opportunity."

147.    However, the statements made in the Company's press release and conference call

with investors exaggerated the efficacy of NC318 and the purportedly promising clinical trial

results, as the Individual Defendants were well aware that the clinical trial, as a whole, did not

result in any evidence of efficacy—and was not designed to allow for such a determination to

begin with. Further, as noted above, two NSCLC patients did not receive biopsies prior to their

treatment with NC318. Thus, the Company was not aware of whether they were included in the patient population that NC318 would seek FDA approval to treat. Further, several other concerns about the data and the manner in which the Phase 1 Study was conducted undercut the accuracy and durability of the patient responses.

### *November 15, 2019: SPO Offering Documents*

148.   Similar to the IPO Offering Documents, the SPO Offering Documents, filed in November 2019, boasted that the success of NextCure's business "depends in part upon our ability to identify targets based on our ***proprietary*** FIND-IO platform and to develop and commercialize immunomedicines. ***Our approach to the discovery of targets using the FIND-IO platform is novel.***" The SPO Offering Documents further noted that the NextCure "use[s its] immunology knowledge, experience, capabilities and ***tools [the Company had] developed***, including [its] FIND-IO platform, to support [its] discovery efforts."

149.   The SPO Offering Documents further stated that the Company "believe[d] NC318 has the potential to treat multiple cancer indications because S15 is expressed in multiple tumor types and has a unique ability to modulate immune responses in the TME. In addition, because S15 and PD-L1 expression in tumors generally appear to be non-overlapping, we believe NC318 may be well suited to treat patients who are not responding to PD-1/PD-L1 directed cancer therapies."

150.   The SPO Offering Documents further discussed the positive Phase 1 data that was presented in the Abstract, while ignoring negative results, and stated, in relevant part:

> Data from the trial indicate activity in multiple tumor types, including durable stable disease in patients with NSCLC, endometrial cell cancer, ovarian cancer, squamous cell carcinoma, Merkel cell cancer and head and neck cancer. As of November 9, 2019, durable responses observed include one complete response, which remains ongoing at 55 weeks, and one partial response, which remains ongoing at 28 weeks, both in NSCLC patients, as well as 14 patients with stable disease, which remain ongoing for between 16 and 42 weeks. Among those 14

patients, four patients have NSCLC, with stable disease ongoing for between 16 and 40 weeks. Three NSCLC patients (out of 13 NSCLC patients in total) have not been in the study long enough to confirm the status of their disease.

151.    The SPO Offering Documents even remarked on the purported efficacy data from NextCure's Phase 1 trial, even though the objective of that trial was only to determine a pharmacologically active dose and/or the maximum tolerable dose of NC318. The SPO Offering Documents stated, in relevant part:

> The Phase 1 portion was designed to determine the pharmacologically active dose, defined as the dose that provides a maximal biologic effect, such as an increase in biomarkers of immune activation or a reduction of biomarkers associated with immune suppression, and/or the maximum tolerable dose of NC318, including defining the optimal dose administration schedule and the maximum number of tolerated doses.
>
> * * *
>
> Data from the trial indicate activity in multiple tumor types, including durable stable disease in patients with NSCLC, endometrial cell cancer, ovarian cancer, squamous cell carcinoma, Merkel cell cancer, and head and neck cancer. As of November 9, 2019, durable responses observed include one complete response, which remains ongoing at 55 weeks, and one partial response, which remains ongoing at 28 weeks, both in NSCLC patients, as well as 14 patients with stable disease, which remain ongoing for between 16 and 42 weeks.

152.    The SPO Offering Documents also purported to warn investors about certain generalized "Risk Factors," including related to "early-stage clinical trials," stating, in relevant part:

> ***Positive results from preclinical studies and early-stage clinical trials may not be predictive of future results. Initial positive results in any of our clinical trials may not be indicative of results obtained when the trial is completed or in later stage trials.***
>
> The results of preclinical studies may not be predictive of the results of clinical trials. Preclinical studies and early-stage clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules, and the results of any early stage clinical trials may not be predictive of the results of later-stage, large-scale efficacy clinical trials. In addition, initial success in clinical trials may not be indicative of results obtained when such trials are completed.

153.    The SPO Offering Documents also warned that "interim and preliminary results"

"*may* change as more patient data becomes available[]"stating in relevant part:

> From time to time, we may publish interim data, including interim top-line results
> or preliminary results from our clinical trials. Interim data and results from our
> clinical trials are subject to the risk that one or more of the clinical outcomes may
> materially change as patient enrollment continues and more patient data become
> available. Preliminary or top-line results also remain subject to audit, validation and
> verification procedures that may result in the final data being materially different
> from the interim and preliminary data we previously published. As a result, interim
> and preliminary data may not be predictive of final results and should be viewed
> with caution until the final data are available. Differences between preliminary or
> interim data and final data could significantly harm our business prospects and may
> cause the trading price of our common stock to fluctuate significantly.

154.    The SPO Offering Documents also warned, generally, that the small sample size of

a clinical trial could skew results, under the heading "Because the number of subjects in our Phase

1/2 clinical trial of NC318 is small, the results from this trial, once completed, may be less reliable

than results achieved in larger clinical trials,":

> A study design that is considered appropriate includes a sufficiently large sample
> size with appropriate statistical power, as well as proper control of bias, to allow a
> meaningful interpretation of the results. The preliminary results of studies with
> smaller sample sizes, such as our ongoing Phase 1/2 clinical trial of NC318, can be
> disproportionately influenced by the impact the treatment had on a few individuals,
> which limits the ability to generalize the results across a broader community, thus
> making the study results less reliable than studies with a larger number of subjects.
> As a result, there may be less certainty that NC318 would achieve a statistically
> significant effect in any future clinical trials. If we conduct any future clinical trials
> of NC318, we may not achieve a statistically significant result or the same level of
> statistical significance seen, if any, in our Phase 1/2 clinical trial.

155.    These statements were false and misleading because the size and heterogeneity of

the patients in the study inhibited it from determining the actual responsiveness of NC318 in

patients—include NSCLC patients—that were tested. These issues made it unlikely that the

Company's product could compete with other market drugs that NextCure purported NC318 could

challenge. Moreover, the responses obtained were not meaningful and did not provide any palpable

evidence of the drug's efficacy. Further, due to the Misappropriation Misconduct, the Company's platform and approach were certainly not "novel" or "proprietary."

### January 16, 2020 J.P. Morgan Healthcare Conference

156.    On January 16, 2020, NextCure and certain of the Individual Defendants, including Defendant Richman, Heller, Cobourn, and Mayer, attended and presented at the J.P. Morgan Healthcare Conference. Defendant Richman stated, in relevant part, regarding the results of the first phase trial:

> And this is a snapshot showing the durability of response as well as the CR and PR that was demonstrated in this trial.
>
> Looking at the responses a little bit more closely, NC318 demonstrated single agent activity. We saw durability of responses and stable disease. We saw immune-related adverse events, but most importantly was this complete response. This was in the 56-year-old non-small cell lung cancer woman that had multiple target lesions, 2 in particular at 0 millimeters based on RECIST criteria. She had 3 prior chemo treatments, then came on [Opdivo]. She progressed, where she saw – where multiple nontarget lesions came into the mix. And over time, being treated with NC318, those target lesions disappeared and those nontarget lesions also disappeared, which ultimately – she was designated as a CR.
>
> In similar vein, our PR individual was a 74-year old gentlemen, also non-small cell lung cancer. He had a PD-L1 TPS score less than 50%, similar to our CR patient. He decided not to go on chemo, but was involved in a Phase 1 clinical trial, looking at a LAG-3, PD-1 combination, ultimately progressed, had 2 big, fairly large target lesions, approximately 2.5 centimeters each. And during week 16, we saw a significant decrease in those target lesions.
>
> So on the conclusions from the Phase I portions of the Phase I/II study of NC318, we demonstrated that the drug was very well tolerated over multiple dose levels. We saw an adverse event profile consistent with what others have seen in immunotherapies, looking at these immune-related adverse events. We have a predictable PK profile efficacy, looking at the CR, the PR and the 3 stable disease in non-small cell lung cancer. We also saw a stable disease in other tumor types such as endometrial and Merkel. And as I mentioned, we initiated the Phase II component of this Phase I/II trial in October of last year.

157.   Defendant Heller even stated that NC318 was the cause of the complete response, stating: "the longer [a patient] was on NC318 and the further she was from the last PD-1 dose [ ] significantly supports that this was a direct result of NC318."

158.   In fact, Defendant Heller was well aware as he misleadingly touted the prospects of NC318 of the mixed clinical trial results from the Phase 1 Study.

***March 12, 2020 Form 10-K***

159.   On March 12, 2020, NextCure filed its annual report on a Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), again stating that NC318 had "***the potential*** to treat multiple cancer indications" and was "***well suited*** to treat patients who are not responding to Pd-1/PD-L1 directed cancer therapies," based on the positive data from the Phase 1 trial, which "***indicate[d] activity in multiple tumor types***." The 2019 10-K was signed by Defendants Richman, Cobourn, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Richman and Cobourn (on behalf of himself and Defendants Kabakoff, Jones, Khuong, Nicholson, Webster, and Xu) attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

160.   These statements were false and misleading because the Phase 1 trial results did not actually support NC318's potential or efficacy. Nevertheless, the Individual Defendants continued to falsely tout the Company's platform and primary product candidate. Unsurprisingly, analysts responded positively to these representations.

***March 12, 2020 Press Release***

161.   On March 12, 2020, the Company issued a press release via GlobeNewswire, reiterating that NC318 had "***the potential*** to treat multiple cancer types, including a complete

response and a partial response in patients with NSCLC and durable stable disease in patients with

NSCLC, endometrial cell cancer, ovarian cancer, squamous cell carcinoma, Merkel cell cancer,

and head and neck cancer."

### April 27, 2020 Proxy Statement

162.    On April 27, 2020, the Company filed the 2020 Proxy Statement with the SEC.

Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu

solicited the 2020 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained

material misstatements and omissions.[5]

163.    The 2020 Proxy Statement contained proposals to be voted on by shareholders,

including the election of Defendants Li, Nicholson, and Xu to the Board, and the ratification of

Ernst & Young LLP as the Company's independent auditor (the "Proposals"). Based in part on the

false and misleading statements contained in the 2020 Proxy Statement, the Proposals were

approved by the Company's shareholders.

164.    The 2020 Proxy Statement also contained the following "Audit Committee

Report," stating, in relevant part:

> The primary function of the Audit Committee is to oversee our accounting and
> financial reporting processes and the external audit of our financial statements on
> behalf of the Board. The Audit Committee operates under a written charter adopted
> by the Board that satisfies applicable SEC and Nasdaq standards and is available in
> the "Investors – Governance" section of our corporate website,
> www.nextcure.com. The Audit Committee reviews the charter and proposes
> necessary changes to the Board on an annual basis.
>
> The Audit Committee has reviewed and discussed with management our audited
> financial statements for the fiscal year ended December 31, 2019 and has discussed
> with EY, our independent registered public accounting firm for the fiscal year
> ended December 31, 2019, the matters required to be discussed by the applicable
> requirements of the Public Company Accounting Oversight Board (the "PCAOB")

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are
based solely on negligence; they are not based on any allegation of reckless or knowing conduct
by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.
Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to
any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

and the SEC. The Audit Committee has also received the written disclosures and the letter from EY required under the applicable requirements of the PCAOB regarding EY's communications with the Audit Committee concerning independence, and discussed with EY its independence.

On the basis of the review and discussions referenced above, the Audit Committee recommended to the Board that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019 for filing with the SEC.

In addition to its oversight of our corporate accounting and financial reporting process, the Audit Committee is responsible for the appointment, oversight, evaluation, and retention of our independent registered public accounting firm. In connection with this responsibility, the Audit Committee annually reviews the qualifications, performance, and independence of the independent registered public accounting firm, including the performance of the lead audit partner, and assures the regular rotation of the lead audit partner as required. In doing so, the Audit Committee considers a number of factors including, but not limited to quality of services provided, technical expertise, knowledge of the industry, effective communication, and objectivity. The Audit Committee also considers whether the non-audit services provided by the independent registered public accounting firm are compatible with maintaining its independence.

The Audit Committee has engaged EY as our independent registered public accounting firm for the fiscal year ending December 31, 2020 and is seeking ratification of such engagement by our stockholders.

165.    This report was signed by Defendants Kabakoff, Li, and Webster, who comprised the Audit Committee at that time.

166.    The 2020 Proxy Statement was further false and misleading because, despite noting that the Company had "adopted a code of business conduct and ethics that applies to all of our directors, officers and employees, including those officers responsible for financial reporting," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

167.    The 2020 Proxy Statement also stated that in 2019 it had "reported *positive* initial clinical data from the Phase 1 portion of our Phase 1/2 clinical trial of our lead product candidate, NC318, and initiated the Phase 2 portion of that trial."

168.    The 2020 Proxy Statement also failed to disclose, *inter alia*: (1) the Misappropriation Misconduct; (2) that the complete NC318 data Defendants possessed did not show that the drug was effective or provide an objective response, especially in most tumor types; (3) that NC318's study protocol was improper and was nevertheless not designed to demonstrate efficacy; and (4) NextCure failed to maintain internal controls, foreseeably placing NextCure's long-term post-IPO and post-SPO prospects at risk. Due to the foregoing, Defendants' statements regarding the Company's business, operations and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 29, 2020 ASCO Presentation and Press Release*

169.    On May 29, 2020, NextCure presented its biomarker data and updated clinical results from the Phase 1 portion of its NC318 clinical trial at the 2020 ASCO annual meeting, and issued a press release the same day via GlobeNewswire.

170.    During the presentation, the Company presented updated clinical and biomarker data from the Phase 1 Study.

171.    The press release quoted Defendant Heller, who stated that the Company "believe[d] these early biomarker data provide additional evidence of NC318 activity."

172.    After NextCure presented a poster at the 2020 ASCO meeting, analysts started questioning the size and design of the clinical trial.

173.    The statements in ¶¶ 124-140, 142-145, 148-154, 156-159, 161, and 169-171 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Misappropriation Misconduct; (2) that the complete NC318 data Defendants possessed did not show that the drug was effective or provide an objective response, especially in most tumor types; (3) that NC318's study protocol was improper and was

nevertheless not designed to demonstrate efficacy; and (4) NextCure failed to maintain internal controls, foreseeably placing NextCure's long-term post-IPO and post-SPO prospects at risk.

## The Truth Begins to Emerge

174.    On January 13, 2020, NextCure filed a Form 8-K with the SEC, making a short announcement that Lilly informed the Company on January 10, 2020 that it was terminating its multi-year collaboration agreement with NextCure for the Company to use its FIND-IO platform to identify novel oncology targets for additional collaborative research and drug discovery by NextCure and Lilly, effective as of March 3, 2020.

175.    On this news, NextCure's stock plunged $4.70 per share, or approximately 8.29%, from closing at $56.70 per share on January 10, 2020 to close at $52.00 per share on January 13, 2020.

176.    On January 16, 2020, Defendant Richman presented at the J.P. Morgan Healthcare Conference, but did not address this news during his presentation. In response, NextCure's stock fell $2.78 per share, or approximately 5.3%, from closing at $52.90 per share on January 16, 2020 to close at $50.12 per share on January 17, 2020.

177.    On February 12, 2020, Immunaccel filed a lawsuit in the Delaware Court of Chancery against Defendant Richman, alleging breach of contract and breach of fiduciary duty to Immunaccel, at which he served as an LLC manager, LLC member, and contract-counterparty.

178.    The lawsuit revealed that Defendant Richman was recruited to help build Immunaccel in 2013—approximately 2 years before he co-founded NextCure in September 2015. He was a manager of Immunaccel from 2015 to 2019.  During Defendant Richman's tenure at Immunaccel, Immunaccel offered "an in vitro three dimensional organotypic platform useful for monitoring the immune cell-tumor microenvironment [*i.e.*, "TME"]" for purposes including "drug

discovery." According to Immunaccel's complaint, Defendant Richman "surreptitiously us[ed] his access to [ ] confidential business information to advance the business of a direct competitor [i.e., NextCure]."

179.    Finally, before the market opened on July 13, 2020, NextCure published a press release via GlobeNewswire titled "NextCure provides an Interim update of the Phase 2 Portion of the NC318 Monotherapy Phase 1/2 Trial and Announces Departure [of its] Chief Medical Officer." Defendant Richman admitted that because "the monotherapy data in the NSCLC and ovarian cancer cohorts [was] *disappointing*," the Company was no longer planning to "***advance the non-small cell lung cancer (NSCLC) and ovarian cancer cohorts in the stage 2 portion of the Simon 2-stage trial***," further citing "***clinical response data***" and "current enrollment criteria."

180.    The Company further announced in the press release that Defendant Heller had "resigned, effective August 4, 2020 to pursue a new opportunity."

181.    On this news, NextCure's stock plunged $9.73 per share, or over 54%, from closing at $17.88 per share on July 10, 2020, to close at $8.15 per share on July 13, 2020, on unusually high trading volume of almost 6.7 million shares.

182.    The media also criticized NextCure. On July 13, 2020, an article published on *Scrip*, titled "Early Promise of NextCure's Novel IO Candidate Continues to Fade," noted that the Company's stock price "[rose] to six times its initial stock price in November based on two responses in lung cancer patients treated with NC318, its novel immune-oncology candidate. However, the company's value has sunk based on updates since then, including a 13 July announcement that it will not advance the NSCLC and ovarian cancer cohorts of an ongoing Phase I/II clinical trial into the Phase II portion of the study." The article further noted that this decision was "based on current enrollment criteria and clinical response data in its all-comer study." The

article emphasized that the Phase II study was "highly anticipated": "The enrollment of NSCLC patients in the Phase II portion of the Phase I/II study was highly anticipated to see if treatment of greater numbers of lung cancer patients could generate additional responses, but now NextCure does not believe it has Phase I data that make Phase II testing worthwhile under the current trial's enrollment criteria."

183.    On July 14, 2020, *Evaluate Vantage* published an article entitled "NextCure's flash in the pan fizzles out," discussing the "unquestionably bad news":

> A glimpse of promise from NextCure's anti-Siglec 15 antibody, NC318, briefly pushed the company's valuation over $2bn last year, though this was quickly erased by an underwhelming SITC presentation. This detailed only two responses in 49 subjects across a range of tumor types, and was followed by an ASCO update that contained no additional signs of efficacy. ***Yesterday came the inevitable: work in NSCLC and ovarian cancers will cease, NextCure said, although head and neck and triple-negative breast cancer cohorts will continue enrolling, with a new partial response seen in the former. But this is unquestionably bad news: Kevin Heller, the company's chief medical officer, is out.*** Failure to find single-agent activity is a big red flag with novel immune-oncology mechanisms, as investors have painfully learned several times over, and its seems extremely unlikely that NC318 is going anywhere. Still, a dearth of evidence did not prevent NextCure from floating at $15 per share in May 2019, and then raising $150m in November at $36.75 – the stock is currently trading at $8.

## DAMAGES TO NEXTCURE

184.    As a direct and proximate result of the Individual Defendants' conduct, NextCure will lose and expend many millions of dollars.

185.    Such losses and expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and the Individual Defendants, actual or potential actions brought against the Company in connection with the Misappropriation Misconduct, including any payments made to settle Immunaccel's claims against Defendant Richman, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

186.     Such losses and expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

187.     As a direct and proximate result of the Individual Defendants' conduct, NextCure has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

188.     Plaintiff brings this action derivatively and for the benefit of NextCure to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of NextCure, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of the Exchange Act, as well as the aiding and abetting thereof.

189.     NextCure is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.     Plaintiff is, and has been at all relevant times, a shareholder of NextCure. Plaintiff will adequately and fairly represent the interests of NextCure in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

191.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

192.     A pre-suit demand on the Board of NextCure is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Richman, Jones, Kabakoff,

Khuong, Morrison, Nicholson, Webster, and Xu (the "Director-Defendants"), and non-party John G. Houston (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

193. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

194. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the Misappropriation Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

195. Demand is also excused as to the Director-Defendants because they were fully aware of the Misappropriation Misconduct throughout the Relevant Period. Nonetheless, the Director-Defendants knowingly permitted and/or caused the Misappropriation Misconduct and caused the Company to disseminate the false and misleading statements related thereto and to the clinical success of NC318, as described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

196.    Additional reasons that demand on Defendant Richman is futile follow. Defendant Richman co-founded the Company and has served as the CEO, President, and as a Company director since October 2015, and is thus, as the Company admits, a non-independent director. He has received and continues to receive handsome compensation, as described above. Defendant Richman was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, press releases, and conferences calls referenced herein. Defendant Richman reviewed, approved, and participated in making statements in both the IPO Registration Statement and in the SPO Registration Statement, each of which he signed, signed the 2019 10-K, and solicited the 2020 Proxy Statement. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Indeed, Defendant Richman was directly responsible for the Misappropriation Misconduct. Moreover, Defendant Richman is a defendant in the Securities Class Action. For these reasons, Defendant Richman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since December 2015. Defendant Jones has received and continues to receive handsome compensation for her role within the Company, as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and

engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Jones participated in the preparation of and signed, or authorized the signing of, the IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. Moreover, Defendant Jones is a defendant in the Securities Class Action. For these reasons, Defendant Jones breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Kabakoff is futile follow. Defendant Kabakoff has served as a Company director since December 2015. Defendant Kabakoff has received and continues to receive handsome compensation for his roles within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Kabakoff participated in the preparation of and signed, or authorized the signing of, the IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. For these reasons, Defendant Kabakoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Khuong is futile follow. Defendant Bhambri has served as a Company director January 2014. Defendant Khuong has received and continues to receive handsome compensation for his role within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Khuong participated in the preparation of and signed, or authorized the signing of, the IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. Moreover, Defendant Khuong is a defendant in the Securities Class Action. For these reasons, Defendant Khuong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Morrison is futile follow. Defendant Morrison has served as a Company director since January 2014. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Morrison participated in the preparation of and signed, or authorized the signing of, IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. Moreover, Defendant Morrison is a defendant in the Securities Class Action. For these reasons, Defendant Morrison breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Nicholson is futile follow. Defendant Nicholson has served as a Company director since March 2020. As a member of the Audit Committee, Defendant Nicholson bears responsibility for the failure of the Company to maintain internal controls. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Nicholson also solicited the 2020 Proxy Statement. For these reasons, Defendant Nicholson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Webster is futile follow. Defendant Webster has served as a Company director since April 2019. As the Chair of the Audit Committee Defendant Webster bears responsibility for the failure of the Company to maintain internal controls. Defendant Webster has received and continues to receive handsome compensation for his role within the Company, as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Webster participated in the preparation of and signed, or authorized the signing of, the IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. Moreover, Defendant Webster is a defendant in the Securities Class Action. For these reasons, Defendant Webster breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Xu is futile follow. Defendant Xu has served as a Company director since November 2018. Defendant Xu has received and continues to receive handsome compensation for her role within the Company, as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in

the Misappropriation Misconduct and scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Xu participated in the preparation of and signed, or authorized the signing of, the IPO Registration Statement and in the SPO Registration Statement, and solicited the 2020 Proxy Statement. Moreover, Defendant Xu is a defendant in the Securities Class Action. For these reasons, Defendant Xu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on the Board is futile follow.

205.    The Director-Defendants have longstanding business and personal relationships, and with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Richman served as President and CEO of Amplimmune, Inc. and Defendant Kabakoff served as a director of the board of that company, from 2007 until 2013. Defendants Richman and Khuong both served as directors of the board of Pieris Pharmaceuticals, Inc. from December 2014 to November 2017. Several of the Director-Defendants also had connections to Pfizer, Inc. Defendant Jones served as Vice President, Worldwide Business Development and Senior Partner at Pfizer Ventures, where she was made and managed venture investments of strategic interest to Pfizer Inc., from December 2008 to April 2019. Before 2012, Defendant Morrison held several positions at Pfizer Inc., including Head, Medical Affairs, Safety and Regulatory Affairs for Pfizer's human health business; and Defendant Nicholson served as president of Pfizer Oncology, from May 2008 until March 2015, and was a member of Pfizer Inc.'s Portfolio Strategy and Investment Committee. Defendants Jones and Li have both served on the board of directors of Gritstone Oncology, Inc.

since September 2017. Finally, Defendants Khuong and Webster both served as directors of the board of Nabriva Therapeutics plc from August 2016 to August 2017. Moreover, five of the Director-Defendants have served at the Company together, with certain of the Individual Defendants, for at least six years. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

206.   As noted above, the subject matter of the Misappropriation Misconduct and the false and misleading statements at issue involved the Company's core operations. The Director-Defendants, as officers and/or directors of the Company were privy to internal documents and information concerning these core operations. Moreover, several of the Director-Defendants are highly sophisticated and educated individuals with backgrounds in pharmaceuticals and biotechnology companies. Thus, the involvement and/or knowledge of the misconduct discussed herein may be inferred.

207.   In violation of the Code of Conduct and/or Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Misappropriation Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct and/or Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and

properly report violations of the Code of Conduct. The Director-Defendants further approved the sale of Company stock to the investing public at artificially inflated prices in the IPO and/or SPO. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

208.    The Director-Defendants, other than Defendant Nicholson, also continue to be defendants in the ongoing Securities Class Action. Accordingly, if the Director Defendants were to pursue these derivative claims, they would undercut or compromise the defense of all defendants in the Securities Class Action, all of whom are also named herein as Defendants. Accordingly, the Director-Defendants are fatally conflicted and, therefore, are unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Demand would thus be futile.

209.    NextCure has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for NextCure any part of the damages NextCure suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

210.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

211.   The acts complained of herein constitute violations of fiduciary duties owed by NextCure's officers and directors, and these acts are incapable of ratification.

212.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of NextCure. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of NextCure, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

213.   If there is no directors' and officers' liability insurance, then the Directors will not cause NextCure to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

214.   Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu for Violations of Section 14(a) of the Exchange Act**

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

218.    Under the direction and watch of the Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu, the 2020 Proxy Statement failed to disclose, *inter alia*, that prior to the IPO: (1) NextCure had copied the 3D technology and 3D assay of its direct competitor and affiliate of Defendant Richman, to create, enhance or otherwise support its FIND-IO platform, exposing the Company to potential legal and reputational risks from claims by Immunaccel; (2) the complete NC318 data Defendants possessed did not show that the drug was effective or provide an objective response, especially in most tumor types, the study protocol was

improper and was nevertheless not designed to demonstrate efficacy; and (3) NextCure failed to maintain internal controls, foreseeably placing NextCure's long-term post-IPO and post-SPO prospects at risk.

219.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

220.     Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose the underlying misconduct, including the Misappropriation Misconduct and false and misleading statements, causing the Company's share price to be artificially inflated.

221.     Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu's failures to abide by them and their engagement in or tolerance of the Misappropriation Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

222.     Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu also caused the 2020 Proxy Statement to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Misappropriation Misconduct.

223.     In the exercise of reasonable care, the Defendants Jones, Kabakoff, Khuong, Li, Morrison, Nicholson, Richman, Webster, and Xu should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were

material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020

Proxy Statement, including but not limited to, election of directors, ratification of an independent

auditor, and the approval of the Proposals.

224.    The misrepresentations and omissions set forth herein were material to shareholders

in voting on the Proposals, who would not have approved, among other things, the election of

Defendants Li, Nicholson, and Xu to the Board, had they been informed about the

Misappropriation Misconduct.

225.    The false and misleading elements of the 2020 Proxy Statement led to, among other

things, the approval of the Proposals and the election of the Defendants Li, Nicholson, and Xu,

which allowed them to breach their fiduciary duties to NextCure.

226.    The Company was damaged as a result of the Defendants Jones, Kabakoff, Khuong,

Li, Morrison, Nicholson, Richman, Webster, and Xu's material misrepresentations and omissions

in the 2020 Proxy Statement.

227.    Plaintiff, on behalf of NextCure, has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants Richman, Cobourn, and Heller for Contribution Under Sections 10(b) and 21D of the Exchange Act

228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

229.    NextCure and Defendants Richman, Cobourn, and Heller (the "Exchange Act

Defendants") are named as defendants in the Securities Class Action, which asserts claims under

the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC

Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities

Class Action for these violations of the federal securities laws, the Company's liability will be in

whole or in part due to the Exchange Act Defendants' willful and/or reckless violations of their obligations as the officers and directors of NextCure.

230. The Exchange Act Defendants, because of their positions of control and authority as the officers and directors of NextCure, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of NextCure, including the wrongful acts complained of herein and in the Securities Class Action.

231. Accordingly, the Exchange Act Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

232. As such, NextCure is entitled to receive all appropriate contribution or indemnification from the Exchange Act Defendants.

### THIRD CLAIM

**Against the Defendants Richman, Cobourn, Kabakoff, Jones, Khuong, Li, Morrison, Shannon, Webster, and Xu for Contribution Under Section 11(f) of the Securities Act**

233. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234. As a result of the conduct and events alleged above, the Company and Defendants Richman, Cobourn, Kabakoff, Jones, Khuong, Li, Morrison, Shannon, Webster, and Xu (the "Securities Act Defendants") are defendants in the Securities Class Action brought on behalf of NextCure shareholders in at least one of which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

235. Federal law provides NextCure with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

236.   The plaintiff in the Securities Class Action alleges that the Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

237.   NextCure is the registrant for the IPO and SPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

238.   As issuer of the shares, NextCure is strictly liable to plaintiff and the class for the misstatements and omissions alleged in the Securities Class Action.

239.   The plaintiff in the Securities Class Action alleges that none of Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

240.   The Securities Act Defendants, because of their positions of control and authority as officers and directors of NextCure, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of NextCure, including the wrongful acts complained of herein and in the Securities Class Action.

241.   Accordingly, the Securities Act Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

242.   As such, NextCure is entitled to receive all appropriate contribution or indemnification from the Securities Act Defendants.

## FOURTH CLAIM

### Against the Defendants for Breach of Fiduciary Duties

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    The Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NextCure's business and affairs.

245.    The Individual Defendants violated and breached his/her/its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

246.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NextCure.

247.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Misappropriation Misconduct. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme and to prevent such conduct from continuing to occur.

248.    In breach of their fiduciary duties owed to NextCure, Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the Misappropriation Misconduct; (2) that the complete NC318 data Defendants possessed did not show that the drug was effective or provide an objective response, especially in most tumor types; (3) that the study protocol was improper and was nevertheless not designed to demonstrate efficacy; and (4) NextCure failed to maintain internal controls, foreseeably placing NextCure's long-term post-IPO and post-SPO prospects at risk.

249.     Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

250.     In further breach of their fiduciary duties, the Defendants failed to maintain internal controls.

251.     Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NextCure's securities.

252.     Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NextCure's securities.

253.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

254. As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, NextCure has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

255. Plaintiff on behalf of NextCure has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants for Unjust Enrichment

256. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, NextCure.

258. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NextCure that was tied to the performance or artificially inflated valuation of NextCure or received compensation that was unjust in light of the Defendants' bad faith conduct.

259. Plaintiff, as a shareholder and a representative of NextCure, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

260. Plaintiff on behalf of NextCure has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants for Abuse of Control

261.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

262.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence NextCure, for which they are legally responsible.

263.    As a direct and proximate result of the Defendants' abuse of control, NextCure has sustained significant damages. As a direct and proximate result of the Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, NextCure has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

264.    Plaintiff on behalf of NextCure has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants for Gross Mismanagement

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of NextCure in a manner consistent with the operations of a publicly-held corporation.

267.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, NextCure has sustained and will continue to sustain significant damages.

268.     As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

269.     Plaintiff on behalf of NextCure has no adequate remedy at law.

## EIGHTH CLAIM

### Against Defendants for Waste of Corporate Assets

270.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused NextCure to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

272.     As a result of the waste of corporate assets, the Defendants are each liable to the Company.

273.     Plaintiff on behalf of NextCure has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of NextCure, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to NextCure;

- 78 -

(c)     Determining and awarding to NextCure the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing NextCure and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NextCure and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. A provision to permit the shareholders of NextCure to nominate at least five candidates for election to the board; and

3. A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding NextCure restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.


Dated: March 24, 2021

Respectfully submitted,

**MURPHY, FALCON & MURPHY**

Of Counsel:

_____

**THE BROWN LAW FIRM, P.C.**          Nikoletta S. Mendrinos (Bar No. 18961)
Timothy Brown                         One South Street, 30th Floor
240 Townsend Square                   Baltimore, Maryland 21202
Oyster Bay, NY 11771                  Telephone: (410) 539-6500
Telephone: (516) 922-5427             Facsimile: (410) 539-6599
Facsimile: (516) 344-6204             Email: nikoletta.mendrinos@murphyfalcon.com
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3287
Email: pkim@rosenlegal.com